NUMBER 13-00-706-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG

 


RAMON JESUS REYES , Appellant,


v.


THE STATE OF TEXAS , Appellee.

 
On appeal from the 36th District Court

of San Patricio County, Texas.


O P I N I O N


Before Justices Hinojosa, Castillo, and Baird (1)

Opinion by Justice Baird


Appellant was charged by indictment with the offense of burglary of a habitation with the intent to commit and actually
committing sexual assault. Tex. Pen. Code Ann. § 30.02(a)(1), (3) (Vernon Supp. 2002). The indictment alleged a prior
felony conviction for the purposes of enhancing the range of punishment. A jury convicted appellant of the charged
offense. Upon appellant's plea of true to the enhancement allegation, the trial court found that allegation true, and assessed
punishment at twenty-five years confinement in the Texas Department of Criminal Justice--Institutional Division. We
reverse.

I. Factual Summary.

Appellant's sole point of error contends the trial judge erred in admitting evidence of an extraneous offense. We will begin
with a summary of the testimony developed in the trial court.

A. The State's Case In Chief.

i. Testimony Related to the Charged Offense.

The State called the following witnesses in its case in chief. We will set forth their testimony in chronological order, rather
than the order they testified at trial.

Mario Dios Dado lived in the same home as the complainant, her husband and their young son; Dios Dado worked with the
complainant's husband. (2) On March 21, 1999, the two men left work at midnight, and returned home where they loaded
their fishing gear from the garage and left. Dios Dado remembered the garage door was not locked when the two departed
from the complainant's residence. 

By March 21, the complainant had lived in her home with her husband, son and Dios Dado for four months, and was
familiar with her neighbors. Appellant lived across the street with his mother who the complainant had visited on several
occasions. She had seen appellant both inside and outside his home. In the early morning hours of March 21, the
complainant and her son were asleep. Although her bedroom light was off, a bright security light shone into the bedroom
from outside. This lighting permitted her to see in the bedroom even when the interior light was off. While laying in her
bed, the complainant felt a finger inside her vagina. She awoke, and saw an intruder whom she identified as appellant. She
began hitting him on the back and said: "You mother fucker, you touched me! It was you!" She chased him out of the
bedroom and through the kitchen where the light was on and she again recognized appellant as the intruder. The chase
continued from the kitchen, through the garage, to the edge of the street where the complainant saw the intruder proceed to
the back of appellant's home. The complainant testified that while inside her home, the intruder knew where he was going. 
She stated he was wearing only boxer shorts, and was not wearing glasses. The complainant testified she had never seen
appellant wearing glasses. 

The complainant further testified the police asked her about a second suspect, but she told the police that suspect, who was
tattooed, was not the intruder. When pressed, the complainant stated she was sticking with her previous statement that the
intruder did not have a tattoo, and did not wear glasses. However, on re-direct examination, she testified she was not sure
whether the intruder had a tattoo. She reiterated that she had seen the intruder's face. She viewed State's exhibit one, a
photograph of appellant wearing only boxer shorts and was asked if she saw a tattoo. She replied: "I don't think so." 

At approximately 2:00 a.m. on March 21, Robin Duggan, a dispatcher with the Aransas Pass Police Department, received a
telephone call from the complainant, who was hysterical. After being calmed by Duggan, the complainant stated she was
asleep in her bed and awakened when she felt someone touching her. The complainant named the intruder as Jesse, a
person who lived across the street. Duggan dispatched police officers to the complainant's home. 

The first officer to arrive at the complainant's home was Roberto Gonzales who met the complainant standing in her garage
holding a small child. The complainant was crying hysterically. She stated she was asleep in her bed with her child when
someone touched her in a "sexual manner." She did not elaborate. When the complainant fully awoke and realized the
person who had touched her was not her husband, she chased the intruder from the bedroom, out of the house and through
the garage. She identified the intruder as Jesse Reyes, a person who lived across the street, and stated he was wearing only
a pair boxer shorts. Patrol Officers Robert Cunningham and Dennis Anders arrived at the scene shortly after Gonzales. 
Both Cunningham and Anders overheard the complainant identify the intruder. Cunningham remembered the complainant
identifying the person not by name, but rather as "the gentleman that lived across the street." However, Anders
remembered the complainant identifying the intruder by the name of Jesse Reyes. 

Darrell Jones, a detective with the Aransas Pass Police Department, received the case from Gonzales. After arriving at the
complainant's home, Jones dusted for fingerprints, photographed the premises and seized the sheets from the complainant's
bed. He interviewed the complainant at the police station where she stated she was awakened by her vagina being rubbed
by the person who lived across the street. Jones compiled a photo spread from which the complainant identified appellant
as the intruder. (3) Jones took this information to a magistrate and obtained a warrant for appellant's arrest. 

At approximately 4:00 a.m., Jones, Gonzales and Anders traveled to appellant's home, which was across the street from the
complainant's, and executed the warrant for appellant's arrest. Appellant was found in a bedroom, lying in a bed with a
female. Jones and Anders testified they noticed redness on appellant's back. Appellant introduced into evidence two
booking photographs which did not show the redness. 

The evidence recovered by Jones at both the complainant's and appellant's homes was tested but rendered negative results
to match appellant.

ii. Testimony of the Extraneous Offense.

At the conclusion of the complainant's testimony, the State sought to offer evidence of an extraneous offense. The trial
court retired the jury, and took the matter under consideration. The State wished to offer the evidence on the issue of
identity, stating the extraneous offense was "very similar" to the charged offense. Appellant objected under Rules of
Evidence 403 and 404(b). Appellant conceded his only defense to the charged offense was identity. 

a. Testimony Outside Jury's Presence.

The trial court heard the following testimony outside the jury's presence. Naomi Mircovich was asleep in her bed with her
husband, Kirk, and their four-year-old son on August 10, 1998. (4) There were others in the house as her other son had
several friends over; they were sleeping in the living room in front of the television. She awoke in the early morning hours
when she felt someone fondling her breasts and vaginal area. Thinking these were amorous advances by her husband,
Naomi asked: "What are you doing?" The intruder replied: "Shhhhh, don't wake your husband." Naomi turned and saw her
husband and son; then turned and saw a man huddled in a fetal position with his head down. She could not see his face. 
She asked: "Who are you?" and the man replied: "My name is Jeremy." The intruder used a chair to enter the residence
through a window. This incident occurred less than one block from the location of the charged offense. 

Kirk Mircovich testified he awoke in the early morning hours of August 10 when his wife screamed his name, and said
someone was in the house. Kirk saw the intruder and began pursuit. He was unable to restrain the intruder. However, he
was able to see the intruder because the living room light was illuminated. Kirk identified appellant as the intruder. Kirk
testified appellant was not wearing glasses, and was fully clothed at the time of this incident. 

At the conclusion of the testimony, the trial court overruled appellant's objections lodged under Rules 403 and 404(b). In
so ruling, the trial court made the following comments:

I don't find that from August the 10th, 1998 to March 21st of 1999 is an outrageously long period of time. I find that each
of these events took place in less than one block from the residence of the Defendant, or within one block of each other. 
Each event took place in the dark of night somewhere between two and three o'clock. If you get rid of Daylight Savings
Time, they probably happened within just a few minutes of each other.

In each of the circumstances the complaining witness was a female in her bedroom not alone in her bed, and indeed had a
child in the bed with them. Whether the husband was home or made it home or not, I don't find particularly germane to the
issue. I find that in each situation the home was actually lit when the person entered the home; that, in each circumstance it
was unforced entry into the home; and that in each circumstance when the perpetrator was confronted he did not resist, but
in fact ran off and exited the residence in the - in what appears to be the way that he entered. And in neither circumstance
was the perpetrator wearing glasses.

I don't know if that has a lot do to with the case, but it certainly seems germane based on the questions that have been asked
of this witness.

On those findings, even though there are some differences, one complaining witness is a Hispanic and one is an Anglo, one
had her husband in bed, and one didn't, I find that these crimes are sufficiently similar to me that I have a hard time telling
them apart. And I will allow them for the limited purpose of aiding the jury, if it does aid the jury, in determining the
identity of the perpetrator in this case, and will allow it over your objection. Your objection is duly noted in the record.

b. Testimony Admitted Before the Jury.

Following the ruling on the admissibility of the extraneous offense, the jury returned to the courtroom, and the trial court
instructed the jury as follows:

Generally speaking, in a case involving a criminal accusation, circumstances or allegations against the Defendant alleging
that they committed some other crime other than the one that he or she is standing trial for is not admissible in court.


In the trial today, I'm going to allow some testimony to come in to the case through this witness and the next witness that
may have to do with some allegations concerning another crime that may have been committed by somebody. I'm going to
allow this testimony in this trial for your to consider, and you'll be getting a written instruction telling me (sic) how you're
to limit your consideration of this testimony.

But I want you to know that the testimony that's being allowed at this point in time is admitted to assist you in determining
the identity of the perpetrator of the charges alleged in this case, and admitted for that purpose and that purpose only. You
cannot consider the testimony that will be coming in through this and the next witness for any other purpose than to help
you, if it does help you, in determining the identity of the perpetrator in this case. Do y'all understand my limitation?


Normally when evidence is introduced, the jury can consider and do anything you want to with it. What I'm telling you is
when this evidence comes in, you have to put it aside in a special little category, and you can use it only for one purpose,
and that's to determine - when you determine identity of the Defendant, if it does help you. I'm not telling you that it will;
but if it does, its's allowed for that purpose. (5)

Naomi then testified that she was at her home on August 10, 1999 along with her husband, their two children and two
friends of her oldest son. As she slept she felt someone fondling her breasts and vaginal area. Thinking it was her husband,
she asked: "What are you doing?" An intruder answered: "Shhhhh, don't wake your husband." Naomi saw a person
crouched down in such a way that Naomi could only see the top of his head, and asked, "Who are you?" And the intruder
replied: "My name is Jeremy." Naomi screamed, the intruder fled, and Kirk pursued. Naomi later determined the intruder
entered though an unlocked window in an empty bedroom.

Kirk testified that he awoke when Naomi screamed that someone was in the house. Kirk identified the intruder as appellant
who was not wearing glasses. Kirk was not able to apprehend appellant who exited the residence through a bedroom
window. 

B. Appellant's Case In Chief.

Appellant's mother, Viola Solis, testified that she lived across the street from the complainant. She met the complainant
when she first moved into the neighborhood, and the two would frequently watch television together in Solis' home.
Appellant began living with Solis after the complainant established her residence; appellant was living with Solis in March
of 1999. He slept in a bedroom with his fianceé, Ruby Gallegos. A fourth person, Hortensia Martinez , also lived in the
home. Solis had surgery on March 14, 1999, which made sleeping difficult. Around midnight on March 21, appellant and
Ruby went to their bedroom. At 1:30 a.m. Solis left her bedroom and turned off the television in the living room. Solis
then peeked into the bedroom and saw appellant and Gallegos in bed. Solis returned to bed where she began watching
television. At 1:50 a.m. Solis heard someone screaming. Solis checked on appellant and Gallegos and they were still in
their bedroom. After hearing a lot of traffic, Solis called her next door neighbor, Gilbert Ramos, who said the screams
were not coming from his house but rather from across the street. Around 3:00 a.m., Solis heard a man say "I'm going to
kill you. I'm going to kill you." At 4:00 a.m. the police arrived. Solis escorted them to appellant's room, and called to
appellant. He awoke, crossed over Gallegos, put on some underwear and eyeglasses, and was subsequently arrested. Solis
stated appellant had been wearing glasses since before the age of ten, that he was required to wear glasses in order to drive,
and that appellant did not wear contact lenses. She testified appellant wore his glasses at all times except when bathing and
sleeping. Solis also identified a photograph of a tattoo of the Virgin Mary on appellant's inner forearm which he obtained
when he was fifteen years old. Photographs of appellant wearing glasses, and of his tattoo were introduced into evidence. 

Ruby Gallegos was appellant's fianceé at the time of the alleged offense; the two had married by the time of appellant's
trial. On March 21, they went to bed between midnight and 12:30 a.m. Gallegos was awakened later by Solis who was
inquiring about someone screaming. Gallegos testified appellant did not leave their bed until his arrest at approximately
4:00 a.m. She testified she would have known if appellant had left their bed, and that the bedroom had only one window
but it had an air conditioner in it. Gallegos stated appellant wore his glasses at all times. She further testified appellant had
a tattoo on his left inner forearm of the Virgin Mary.

Hortensia Martinez testified that on March 21 she was asleep in her bedroom which was next to appellant's. She also
testified that she had not been awakened by anyone prior to the police arriving to arrest appellant. 

Amber Moss, a forensic scientist with Gene Screen, examined and tested the sheets and pillow cases from the
complainant's bed, the shorts the complainant wore on the night of March 21, a sleeping bag and a pair of boxer shorts from
appellant. Her results revealed no DNA match with appellant. 

Richard Lasarte, an optometrist for twenty-two years, examined appellant's eyes following his arrest for the instant offense. 
Lasarte testified that appellant suffered an astigmatism which is a condition that affects the shape of the cornea. The
astigmatism caused blurred and distorted vision without the use of corrective lenses. Without eyeglasses, appellant is
legally blind. Lasarte stated that people with vision problems like appellant wore glasses for two reasons: first, without
glasses, they would not be able to identify faces or judge distances; second, this vision impairment without glasses would
lead to headaches and tremendous eye strain. Furthermore, the dryness of appellant's eyes prevented him from wearing
contact lenses. Lasarte stated to a reasonable medical probability that appellant's eyesight was so deficient that he could not
maneuver without glasses in an unfamiliar place without using his hands to guide him. 

C. State's Rebuttal.

In rebuttal, the State called several witnesses. George Hammond, who was outside the home of Gilbert Ramos in the early
morning hours of March 21, testified he saw Gallegos crossing the street between 2:00 and 4:00 a.m. However, Hammond
did not see anyone run from the complainant's home. He further testified that he had not known appellant to wear glasses
before March 21, but that appellant began wearing glasses afterwards. A neighbor, Rita Villarreal, testified that she saw
appellant without glasses several times. She also saw Gallegos crossing the street prior to appellant's arrest. Ramon
Villarreal, another neighbor, testified to having seen appellant without glasses. Finally, Corporal Gonzales was recalled
and testified that when appellant got out of his bed, he did so by getting out on his side, and not by crossing over Gallegos. 

D. Defense's Rebuttal.

Viola Solis was recalled as a witness, and through her appellant introduced several more photographs, each showing him
wearing glasses. Additionally, Felix Esquivel was called as a witness. Esquivel lived with Gallegos's mother in a house
across the street from Solis. Esquivel stated appellant always wore glasses. He further testified that Gallegos did not come
to his home until after appellant's arrest.

E. Jury Instruction and Closing Arguments.

At the conclusion of the testimony, the trial court included the following instruction in the jury charge.

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed an
offense other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any
purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offense, if any was
committed, and even then you may only consider the same in determining the identity of the defendant, if any, in
connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

Both attorneys referred to the extraneous offense in their arguments. Defense counsel reminded the jury of the limited
purpose for which the evidence was admitted and argued: "If you go back [to the jury deliberations room] and you convict
[appellant] on the sole basis of the Mircovich case, that would be against the law, because you can only rely on it for
identity." In contrast, the State used the opportunity to conclude the arguments with an extended reference to the
extraneous offense to bolster the complainant's identification of appellant, and to undermine the testimony of Dr. Lasarate.

During its deliberations, the jury sent the trial court a note requesting more specificity "about the phrase 'for identification
purposes' only in the Mircovich testimony." The record is silent as to what, if any, response the trial court made to this
request. Ultimately, the jury convicted appellant of the charged offense.

II. Extraneous Offenses.

In the instant case, trial counsel lodged specific and timely objections on the basis of Rules 403 and 404(b) of the Texas
Rules of Evidence. Therefore, this issue is preserved for our review, and we shall reach the merits of appellant's point of
error. We are instructed by Montgomery v. State, 810 S.W.2d 372, 386 (Tex. Crim. App. 1990) (op. on reh'g), that appellate
review of the trial court decision to admit the extraneous offense evidence is a two-fold process. 

A. Rule 404(b) Analysis.

It is a fundamental tenet of our criminal justice system that an accused may be tried only for the offense for which he is
charged and not for being a criminal generally. Owens v. State, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992). Rule 404(b)
incorporates this tenet by prohibiting the admission of uncharged misconduct evidence that shows nothing more than the
accused's general propensity to commit criminal acts. Id. Specifically, Rule 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in
conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of mistake or accident, ....

Therefore, in order for evidence of other crimes, wrongs, or acts to be admissible, it must have relevance apart from its
tendency to prove character conformity. Montgomery, 810 S.W.2d at 387. Relevant evidence is that which has a tendency
"to make the existence of any fact that is of consequence to the determination of the action more probable or less probable
than it would be without the evidence." Tex. R. Evid. 401. Therefore, evidence of extraneous conduct that logically serves
to make more probable or less probable (1) an elemental fact; (2) an evidentiary fact that inferentially leads to an elemental
fact; or (3) defensive evidence that undermines an elemental fact is relevant beyond its tendency to prove the character of a
person to show that he acted in conformity therewith. (6) Montgomery, 810 S.W.2d at 387.

In the instant case, the trial court determined the extraneous offense evidence was relevant apart from character conformity
because it tended to establish the elemental fact of identity, and instructed the jury accordingly. Tex. R. Evid. 105(a).
When reviewing a trial court's ruling under Rule 404(b) we employ the abuse of discretion standard. Montgomery, 810
S.W.2d at 391. In this context, if "the trial court's ruling was at least within the zone of reasonable disagreement, the
appellate court will not intercede." Id. In the case at bar, when the trial court was considering the Rule 404(b) objection,
the following exchange occurred:

THE COURT: [Defense counsel], correct me if I am wrong, the defense in this case is identity, right?


DEFENSE COUNSEL: Right, that was incorrect (sic).

THE COURT: I mean, there is no other defense to this case. I haven't heard that the crime wasn't committed, I haven't
heard there was no penetration, that the actor whoever it was, was not attempting to commit a Sexual Assault. There is one
issue in this case for the jury to decide, and that issue is identity; am I correct?


THE STATE: That's correct, Your Honor.


DEFENSE COUNSEL: Yes, that's correct.


THE COURT: I'll allow it with a limiting instruction. I'll note your exception, [defense counsel].

Our case law is clear that extraneous offense evidence may be admissible to show identity only when identity is an issue in
the case. Lane v. State, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996); Moore v. State, 700 S.W.2d 193, 201 (Tex. Crim.
App. 1985). In light of the mutual agreement of the parties that the only issue in the case was identity, we do not find the
trial court abused its discretion in ruling the evidence of the extraneous offense was relevant to the elemental fact of
identity apart from its tendency to prove the character conformity. Montgomery, 810 S.W.2d at 387. (7) 

B. Rule 403 Analysis.

Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger
of unfair prejudice. Tex. R. Evid. 403. (8) Texas Courts have followed their federal counterparts and have interpreted Rule
403 to require exclusion when prejudice outweighs probative value. Montgomery, 810 S.W.2d at 392 (quoting United
States v. Preston, 608 F.2d 626, 639, n. 16 (5th Cir. 1979)). We apply the abuse of discretion standard when analyzing the
trial court's decision to admit evidence over a Rule 403 objection. Montgomery, 810 S.W.2d at 391. This analysis requires
more than simply determining whether the trial court conducted a balancing of probativeness and prejudice. Id. at 392. 
Instead, we measure the trial court's decision to admit the extraneous offense evidence against the relevant criteria by which
a Rule 403 decision is to be made. Id. (9) When the relevant criteria is viewed objectively and leads to the conclusion that
the danger of unfair prejudice substantially outweighed the probative value of the proffered evidence, the appellate court
should declare that the trial court erred in failing to exclude it. Id. Finally, when determining whether an abuse of
discretion occurred, we consider only evidence adduced at the suppression hearing because the ruling was based on it rather
than evidence introduced later. Rachal v. State, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996); Hardesty v. State, 667
S.W.2d 130, 135 n. 6 (Tex. Crim. App. 1984). (10)

i. The State's Need for the Extraneous Offense Evidence.

Determining the admissibility of extraneous offense evidence focuses not only on the relevance of that evidence, but the
State's need for it as well. Montgomery, 810 S.W.2d at 392. Although rare, the State's need for the extraneous offense
evidence may arise as a result of the defendant's cross-examination. Because permitting the introduction of an extraneous
offense merely because of cross-examination would undermine the constitutional right to confront one's accusers, U.S.
Const. amend VI; Tex. Const. art. I, § 10, the identifying witness must be impeached about (1) a material detail of the
identification; (2) the conditions surrounding the charged offense and the witness' identification of the defendant in that
situation; or, (3) an earlier misidentification of the defendant. Siqueiros v. State, 685 S.W.2d 68, 71 (Tex. Crim. App.
1985).

In the instant case, the cross-examination of the complainant was inefficacious, and she was not impeached in any material
respect. (11) While she testified the intruder did not have a tattoo, there was no evidence at that time to show appellant did,
in fact, have a tattoo. The only photograph introduced at the time of her cross-examination showed appellant's outer arms. 
His inner forearm, which is tattooed, is not visible in the photograph. (12) She further testified that the conditions at the time
of the offense were conducive to making a positive identification because of the bright security light outside her bedroom
window, and the kitchen light was illuminated. Finally, there was no evidence the complainant made an earlier
misidentification of the defendant. To the contrary, the testimony is clear that she identified appellant from a photo spread,
and that she did not identify a second suspect. Additionally, she identified appellant as the perpetrator to Duggan, the
dispatcher, and to Officer Gonzales. The latter identification was overheard by Officers Cunningham and Anders.
Therefore, we find the State's need for the extraneous offense evidence was non-existent. Consequently, we hold the trial
court erred in admitting that evidence during the State's case-in-chief.

ii. Untimely Admission of Extraneous Offense Evidence.

Error stemming from the premature admission of extraneous offense evidence may be cured by a defendant's subsequent
actions at trial. Siqueiros, 685 S.W.2d at 72; Rubio v. State, 607 S.W.2d 498, 502 (Tex. Crim. App. 1980). (13) An alibi
defense may raise the issue of identity. Mayfield v. State, 803 S.W.2d 859, 867 (Tex. App.-Corpus Christi 1991, no pet.);
Bruce v. State, 707 S.W.2d 651, 652 (Tex. App.-Corpus Christi 1985, pet. ref'd). In the instant case, appellant raised the
defensive theory of alibi when Solis and Gallegos testified he was at home when the charged offense occurred. 
Additionally, those witnesses raised the issue of identity when they testified as to appellant's glasses and tattoo. Therefore,
we find that even though there was no need to admit the extraneous offense evidence during the State's case in chief, there
was such a need after appellant's case in chief. Therefore, the evidence may have been admissible in rebuttal.

iii. Similarity of Offenses.

Our law is clear that raising the issue of identity does not automatically render extraneous offense evidence admissible. 
Lane, 933 S.W.2d at 519. The traditional rule regarding the admission of such evidence for the purpose of showing identity
is that the extraneous offense must be so similar to the offense charged that the accused's acts are marked as his handiwork,
that is, his signature must be apparent from a comparison of circumstances in both cases. Bishop v. State, 869 S.W.2d 342,
346 (Tex. Crim. App. 1993) (citing Beets v. State, 767 S.W.2d 711, 740 (Tex. Crim. App. 1987)); Owens, 827 S.W.2d at
915; Messenger v. State, 638 S.W.2d 883 (Tex. Crim. App. [Panel Op.] 1982), overruled on other grounds, Almanza v.
State, 686 S.W.2d 157 (Tex. Crim. App. 1984); Collazo v. State, 623 S.W.2d 647 (Tex. Crim. App. 1981). The Court of
Criminal Appeals has long recognized that to some extent the commission of any particular offense will have some generic
qualities: 

there will always be similarities in the commission of the same type of crime. That is, any case of robbery by firearms is
quite likely to have been committed in much the same way as any other. What must be shown to make the evidence of the
extraneous crime admissible is something that sets it apart from its class or type of crime in general, and marks it
distinctively in the same manner as the principal crime.

Ford v. State, 484 S.W.2d 727, 730-31 (Tex. Crim. App. 1972). See also Murphy v. State, 587 S.W.2d 718, 721-22 (Tex.
Crim. App. 1979). Therefore, each case must be measured on its own merits. And this measurement must reveal some
connective similarity, either in the singular or plural, that rises to the level of a distinguishing characteristic common to
both the extraneous offense and the offense charged.

By way of example, in Walker v. State, 588 S.W.2d 920, 924 (Tex. Crim. App. 1979), the court found the charged and
extraneous offenses to be sufficiently similar because both occurred at night, in the same area, within a period of one
month. The perpetrator was alone, carried a small gun, and tied up the victims in a similar manner. Additionally, in both
cases a robbery preceded the rape, and all coins but pennies were stolen from the victims. Id. Similarly, in Clarke v. State,
785 S.W.2d 860, 867 (Tex. App.-Ft. Worth 1990), aff'd 811 S.W.2d 99 (Tex. Crim. App. 1991), the court found the
evidence of an extraneous sexual assault was sufficiently similar to the offense charged where in both offenses: the victims
were attacked at home during the night; the assailant used duct tape to blindfold both victims and bind their hands and feet;
the assailant's face was covered during both attacks; the assailant used a knife in the attack, and asked each victim whether
she had a gun in the house; the assailant forced each victim to engage in sexual intercourse several times; and, the assailant
either washed the victim's vagina after the attack or made the victim wash her vagina before he left. Id. 

But there have been any number of cases where the offenses were not sufficiently similar. Ford, 484 S.W.2d at 730. The
most recent example is Avila v. State, 18 S.W.3d 736, 741 (Tex. App.-San Antonio 2000, no pet.), where the State
successfully argued in the trial court that the two offenses were sufficiently similar because: both rapes occurred in the
dark, at night, when both victims were asleep; both occurred in Crystal City; in both instances the perpetrator entered the
room without the consent of the victim; in both instances the perpetrator turned the victims over; in both instances the
sexual act was essentially in the same type of position. However, the Avila Court held:

[T]here is nothing in this case that would act as the signature of the perpetrator and affirmatively link the charged offense to
the extraneous offense. Although the two offenses share some similarities, we find those similarities are not substantial
enough to warrant the admissibility of the extraneous conduct testimony. Both rapes occurred within the city limits of
Crystal City during the early morning hours while both victims were sleeping. In each case, the assailant entered the
premises without the consent of the victim and raped each victim in a common sexual position. None of these similarities
would mark both offenses as the handiwork of the accused. Instead, the similarities are more in the nature of the
similarities common to the type of crime itself, rather than similarities peculiar to both offenses involved here.

Avila, 18 S.W.3d at 741 (internal quotation marks and citations omitted). See also Bishop, 869 S.W.2d at 346 (acts
testified to by ex-wife were not so unusual and distinctive and so nearly identical to the charged offense as to amount to a
signature of the defendant).

In the instant case, the similarities are the intruder, not wearing glasses, entered two residences in the same vicinity, in the
early morning hours, fondled the complainants while they slept with a child, and fled when they awoke. In Messenger, 638
S.W.2d at 886-87, the Court of Criminal Appeals held the similarities between the two offenses, namely the assailant
entering the victim's houses at night, uninvited, when no man was present in the house, were not so distinctive to rise to the
level of the defendant's signature. Likewise, we find the similarities in the instant case are more in the nature of the
similarities common to this type of crime itself, i.e., burglary of a habitation with intent to commit and committing sexual
assault, rather than similarities peculiar to both offenses. (14) Beyond these similarities, are a number of dissimilarities: the
complainants were not of the same race; the intruder was fully clothed in one, but wearing nothing but boxer shorts in the
other; (15) on the earlier occasion the intruder fondled both the breasts and vaginal area of the person, while on the latter the
intruder fondled only the vaginal area which resulted in digital penetration; the bedroom in the extraneous offense was not
lit, but the complainant's bedroom was well lit by an exterior light; there were several people at home in the first offense
but only the complainant and her son in the charged offense; and, entry in the extraneous offense was gained by using a
chair and climbing through a window, but in the charged offense it was through the unlocked garage. We find no signature
characteristic unique to these offense as to mark them as having been committed by the same individual. Without
sufficient similarity, the probative value of the extraneous offense evidence is substantially outweighed by its prejudicial
effect. Bishop, 869 S.W.2d at 346.

In addition to similarity, remoteness is another factor to be considered in determining whether the extraneous offense bears
the defendant's signature. Clarke, 785 S.W.2d at 866. In the instant case, the extraneous offense occurred on August 10,
1998, and the charged offense occurred on March 21, 1999, a period of seven months and eleven days. As a general rule,
the greater the time period between the charged and extraneous offenses, the greater likelihood of error in admitting the
evidence of the extraneous offense. Siqueiros, 685 S.W.2d at 68 (twenty-six days; upheld); Dickey, 646 S.W.2d 232, 233
(Tex. Crim. App. 1983), (five days; affirmed);Messenger, 638 S.W.2d at 885 (nineteen days; reversed); Bachhofer v. State,
633 S.W.2d 869 (Tex. Crim. App. 1982) (fifty-two months; reversed); Ford, 484 S.W.2d at 731 (two months, reversed);
Collazo, 623 S.W.2d at 648 (one year; reversed);Wintters v. State, 616 S.W.2d 197, 199 (Tex. Crim. App. 1981) (two
months; affirmed); Collins v. State, 577 S.W.2d 236, 238 (Tex. Crim. App. 1979) (twelve days; affirmed); James v. State,
554 S.W.2d 680, 683 (Tex. Crim. App. 1977) (thirty-three months; reversed); McDonald v. State, 513 S.W.2d 44, 51-52
(Tex. Crim. App. 1974) (one year; affirmed); Robledo v. State, 480 S.W.2d 401, 402 (Tex. Crim. App. 1972) (fifty-one
months; reversed). 

However, the El Paso Court of Appeals recognized a corollary rule after a careful examination of the temporal proximity
evaluation in the aforementioned cases. Lang v. State, 698 S.W.2d 735 (Tex. App.-El Paso 1985, no pet.). The Lang
Court found that in each of the cases reversed primarily upon remoteness, there was "a great time lapse with no intervening
relevant misconduct to narrow the gap." Id. at 737. In applying this rule, the court found the defendant's subsequent
telephoning of the victims to be a distinguishing factor because the telephone calls evidenced "a peculiar diligence in
locating their names and telephone numbers and a peculiar persistence of interest in them which rises to the level of
signature status." Id. at 737-38. Therefore, the remoteness of thirty-nine months did not militate toward reversal because
"this particular modus operandi was alive and operative through the intervening period." Id. However, when this rule is
applied in the instant case, we find no intervening misconduct to narrow the seven month and eleven day gap.

Under Montgomery when the record reveals "a risk that the probative value of the tendered evidence is substantially
outweighed by unfair prejudice, then an appellate court should conclude that the trial court acted irrationally in failing to
exclude it, and thus abused its discretion." 810 S.W.2d at 393. For the reasons stated above, we find we are presented with
such a record in the instant case. The relevant criteria, viewed objectively, leads us to the conclusion that the danger of
unfair prejudice substantially outweighed the probative value of the extraneous offense evidence. Id. at 392. Therefore, we
hold the trial court erred in admitting the extraneous offense evidence on the issue of identity. Tex. R. Evid. 403.

iv. Admissible for Another Purpose.

The State argues that if the extraneous offense evidence was not admissible on the issue of identity, it was nevertheless
admissible to rebut appellant's alibi. We reject this argument for two reasons. First, the evidence was not offered in the
trial court for the limited purpose of rebutting appellant's alibi. Indeed, it could not have been because appellant had not
raised his alibi when the extraneous offense was admitted. Consequently, the jury was not instructed that it could consider
the evidence for that limited purpose. Tex. R. Evid. 105(a). (16) Such a limiting instruction must be given at the time the
evidence is admitted, otherwise the jury is permitted to consider the evidence for all purposes. Hammock v. State, 46
S.W.3d 889, 895 (Tex. Crim. App. 2001). Therefore, for an appellate court to hold the trial court erred in admitting
evidence for a limited purpose, e.g., identity, but to further hold the evidence was admissible for a separate limited purpose,
e.g., to refute a defensive theory, would wholly undermine the rationale and utility behind Rule 105(a).

Beyond the impact of such a holding on Rule 105(a), there is federal precedent in this area. In Giordenello v. United
States, 357 U.S. 480, 488 (1958), the defendant challenged the validity of the warrant which led to his arrest and, in turn,
the seizure of heroin. The trial court found the warrant was valid and overruled the motion; the Fifth Circuit Court of
Appeals affirmed; and, the Supreme Court granted certiorari to consider the legality of the arrest. When the Supreme
Court found the warrant was deficient, the prosecution advanced an alternative argument to support the seizure. The
Supreme Court refused to consider the alternative argument because it had not been advanced in the trial court. "To permit
the Government to inject its new theory into the case at this stage would unfairly deprive [the defendant] of an adequate
opportunity to respond. This is so because in the District Court [the defendant], being entitled to assume that the warrant
constituted the only purported justification for the arrest, had no reason to cross-examine [the arresting officer] or to adduce
evidence of his own to rebut the contentions that the Government makes here for the first time." Giordenello, 357 U.S. 480,
488. (17)

The same is true in the instant case. As can be seen in part I, A, ii, supra, the State's only argument in the trial court
justifying admission the extraneous offense evidence was the issue of identity. That it was admitted for this limited
purpose is borne out by the trial court's instruction to the jury at the time of its admission to consider the evidence only "in
determining the identity of the perpetrator." Accordingly, appellant was entitled to assume identity was the sole purpose for
admitting the evidence and responded only to that argument. Therefore, consistent with Giordenello, the State is not now
permitted to advance the alternative argument that the extraneous offense evidence was admissible to rebut appellant's alibi.

Second, even if such an argument were permissible, we hold the extraneous offense evidence was not admissible to rebut
appellant's alibi. Evidence to rebut alibi is admissible if it places the accused at a place where he claimed not to be, or if the
evidence shows the impossibility of his alibi, notwithstanding the fact that it shows the commission of an offense, even if
that offense is dissimilar to the charged offense. Ford, 484 S.W.2d at 731. "This is so because in the case of alibi, the
evidence is offered to show that the accused was not where he claimed to be, and similarity is not an element of
admissibility." Id. But if the alibi concerns only the date of the charged offense, evidence that the defendant committed an
offense on a different date does not refute the alibi. Id. Applying this precedent to the instant case, we find the extraneous
offense which was more than seven months before the charged offense, could not serve to refute appellant's alibi which was
limited to the date of the charged offense, March 21, 1999. Messenger, 638 S.W.2d at 887. (18)


IV. Harm Analysis

Having determined the trial court erroneously admitted the extraneous offense evidence, we must conduct a harm analysis. 
Rule 44.2(b) of the Texas Rules of Appellate Procedure prescribes the harm analysis for error stemming from the erroneous
admission of extraneous offense evidence. Tex. R. App. P. 44.2(b); Webb v. State, 36 S.W.3d 164, 181 (Tex.
App.-Houston [14th Dist.] 2000, pet. ref'd). Under that rule, error that does not affect a substantial right must be
disregarded. A substantial right is violated when the error had a substantial and injurious effect or influence in determining
the jury's verdict. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. U.S., 328 U.S. 750, 776
(1946)). If the error had no influence or only a slight influence on the verdict, it is harmless. Johnson v. State, 967 S.W.2d
410, 417 (Tex. Crim. App. 1998). However, if the reviewing court is unsure whether the error affected the outcome, the
court should treat the error as harmful, i.e., as having a substantial and injurious effect or influence in determining the jury's
verdict. Webb, 36 S.W.3d at 182. Neither party has the burden of proof under rule 44.2(b). Id. Rather, the appellate court
will examine the record for purposes of determining harm. Id.

As noted above, the extraneous offense evidence was relied upon heavily by the State in its final argument to both bolster
the testimony of the complainant and to undermine the credibility of Dr. Lasarte. Additionally, we find the evidence was
considered by the jury to some extent because of the jury's note asking the trial court how to apply the Mircoviches'
testimony "for identification purposes." And because the evidence carried little probative value, it would tend to impress
upon the jury the notion that appellant acted in conformity with his character, an impression the law seeks to avoid. Tex. R.
Evid. 404(a); Avila, 18 S.W.3d at 742. Finally, we know from established precedent that evidence of sexually related
misconduct is inherently inflammatory. Bishop, 869 S.W.2d 346. Accordingly, we find the erroneous admission of the
extraneous offense evidence had a substantial and injurious effect or influence on the jury's verdict. Consequently, we hold
a substantial right was affected. See Tex. R. App. P. 44.2(b). Appellant's sole point of error is sustained.

The judgment of the trial court is reversed, and this cause is remanded for a new trial.



___________________________

Charles F. Baird,

Justice



Publish .

Tex. R. App. P. 47.3(b).



Opinion delivered and filed

this 31st day of January, 2002.

1. Former Court of Criminal Appeals Judge Charles F. Baird assigned to this Court by the Chief Justice of the Supreme
Court of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. Dios Dado further testified the complainant's husband had been killed in an automobile accident between the date of the
alleged offense and the time of trial. 

3. When asked why he did not ask the complainant for a description of the intruder, Jones answered: "[S]he had already
told the officer at the scene his name, knew where he lived, and she identified him out of a photo line-up. I was convinced
that she knew who the perpetrator was."

4. It is the author's policy not to refer to complainants by name. However, because of the circumstances presented here
that policy cannot be followed.

5. We note that the limiting instruction was deficient in one respect; it failed to instruct the jury that they must first believe
the evidence beyond a reasonable doubt. Ex parte Varelas, 45 S.W.3d 627, 632 (Tex. Crim. App. 2001) (citing George v.
State, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994) (if requested at guilt phase of trial, the trial court must instruct the jury
not to consider extraneous offense evidence admitted for a limited purpose unless it believes beyond a reasonable doubt
that the defendant committed the extraneous offense.).

6. Examples of elemental facts are identity or intent; evidentiary facts are motive, opportunity or preparation which lead
inferentially to an elemental fact; a defensive theory may be mistake or accident. Montgomery v. State, 810 S.W.2d 372,
387-88 (Tex. Crim. App).

7. Owens v. State, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992), is an excellent example of evidence that does not have a
relevance apart from character conformity. In Owens, the only ultimate fact in dispute was whether the appellant
committed the charged offense, i.e., aggravated sexual assault of a child; there was no dispute as to identity, motive, intent
or any of the other exceptions listed in Rule 404(b). The jury heard the testimony of the defendant and the complainant,
appellant's daughter; the State then produced another of the appellant's daughters as a rebuttal witness after the appellant
denied the offense occurred. The Court of Criminal Appeals held that evidence of an extraneous offense tending to show
the appellant's "system" could not assist the jury in its determination of whether or not the appellant molested the
complainant except by showing character conformity in violation of rule 404(b). Thus, under Rule 404(b), evidence of an
extraneous crime, wrong or act is admissible only if it helps prove something other than simple propensity to commit
crimes.

8. In its entirety, Rule 403 states: "Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue
delay, or needless presentation of cumulative evidence."

9. The Montgomery Court specifically noted the following as a non-exhaustive list of relevant criteria: (1) the ultimate
issue was not seriously contested by the opponent; (2) that the State had other convincing evidence to establish the ultimate
issue to which the extraneous misconduct was relevant; (3) that the probative value of the misconduct evidence was not,
either alone or in combination with other evidence, particularly compelling; and, (4) that the misconduct was of such a
nature that a jury instruction to disregard it for any but its proffered purpose would not likely have been efficacious. 810
S.W.2d at 392-3. As will be seen infra, the relevant criteria in the instant case are the State's need for the evidence and
whether the two offenses are sufficiently similar.

10. An exception to this general rule is applicable where the suppression issue has been consensually re-litigated by the
parties during trial on the merits. Hardesty v. State, 667 S.W.2d 130, 135 (Tex. Crim. App. 1984). That exception is not
applicable in the instant case.

11. The complainant gave three statements regarding the charged offense; statements one and two were made to male
officers, the third was given to a female officer. She did not mention the vaginal penetration to the male officers as she felt
uncomfortable. However, the complainant did tell the female officer of the penetration. She admitted that in her three
statements she did not say that she had seen appellant before the date of the alleged offense. 

12. The instant case is distinguishable from Walker v. State, 588 S.W.2d 920 (Tex. Crim. App. 1979), where defense
counsel asked the complainant if she noticed any tattoos and scars on her assailant. When the complainant responded
negatively, defense counsel had the defendant stand and display his scars and tatoos for the witness and jury.

13. These cases actually use the term "harmless" in this situation. However, we believe the more accurate term is "cured"
because the complaint about the untimely admission is alleviated when the subsequent events at the trial render the
evidence admissible.

14. This is borne out by the State argument in the instant case that these offenses are sufficiently similar as to be the
handiwork of appellant because, inter alia, (1) both offenses occurred by the offender breaking into private residences; (2)
both residences where the offenses occurred were houses; (3) both victims were females; (4) both victims were married
with children; (5) both victims were living in their homes with their husbands and children; and, (6) in both cases the
appellant entered the residence without consent. But these common characteristics would fit the facts of virtually any
burglary of a habitation with the intent to commit and committing sexual assault.

15. The State explained the difference in dress by arguing appellant wore pants to the Mircovich home because of the
distance from his house, but wore only boxer shorts to the complainant's home because it was closer. But this argument
cuts both ways; by arguing the greater distance is the reason for appellant wearing pants, the State undermines its argument
that the offenses were in close proximity.

16. Rule 105(a) states in relevant part: When evidence which is admissible as to one party or for one purpose but not
admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its
proper scope and instruct the jury accordingly; ...

17. Giordenello has been favorably cited for that proposition by the Court of Criminal Appeals. State v. Mercado, 972
S.W.2d 75, 77 (Tex. Crim. App. 1998). See also, Steagald v. United States, 451 U.S. 204, 209 (1981).

18. Twenty years ago, the Messenger Court attempted to clarify the misconception that the defense of alibi necessarily
authorized the admission of extraneous offense evidence. In Messenger, neither of the extraneous offenses occurred on the
night of the charged offense. Therefore, neither extraneous offenses tended to show the defendant was not where he said he
was on the night of the charged offense, namely with his ex-wife. Therefore, the extraneous offense evidence was not
admissible to rebut the alibi. Messenger v. State, 638 S.W.2d 883, 887 (Tex. Crim. App. [Panel Op.] 1982).