**Charlie Melvin PAGE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 13–00–035–CR, 13–00–042–CR.**

Court of Appeals of Texas,
Corpus Christi–Edinburg.

Aug. 4, 2005.

Rehearing Overruled Sept. 29, 2005.

---

Mark J. Kelly, Texas City, for appellant.

B. Warren Goodson, Asst. Criminal Dist. Atty., Michael J. Guarino, Criminal Dist. Atty., Galveston, for state.

Before Chief Justice VALDEZ and Justices RODRIGUEZ and BAIRD [1].

## OPINION ON REMAND

Opinion by Justice BAIRD.

Appellant was charged in separate indictments with the offenses of sexual assault and impersonating a peace officer. The cases were combined into a single trial where a jury convicted appellant of both offenses and assessed punishment at seven years and five years confinement, respectively, in the Texas Department of Criminal Justice—Institutional Division. We reversed the judgment of the trial court. *See Page v. State*, 88 S.W.3d 755 (Tex. App.-Corpus Christi 2002), *rev'd*, 137 S.W.3d 75, 79 (Tex.Crim.App.2004). The Texas Court of Criminal Appeals, in turn, reversed our judgment and remanded the case to us for reconsideration. *Page v. State*, 137 S.W.3d 75, 79 (Tex.Crim.App. 2004). We again reverse the judgment of the trial court.

## I. The Scope of The Remand

On direct appeal, appellant contended the trial court violated Texas Rules of Evidence Rules 403 and 404(b) in admitting extraneous offense evidence. See Tex.R. Evid. 403, 404(b). Although both arguments were preserved for appellate review, we found it necessary to address only the Rule 404(b) argument and determined the trial court abused its discretion in admitting the complained-of evidence. This determination was based upon two independent holdings. First, the extraneous offense evidence was not admissible

because the complainant was not impeached on cross-examination regarding her identification of appellant. Second, assuming the complainant had been impeached, the impeachment was not related to a "material detail" of her identification of appellant.

The court of criminal appeals disagreed with both of our holdings. Regarding the impeachment of the complainant the Court stated:

[D]efense counsel's cross-examination of the victim suggested that his 265 pound client was not her 200 pound assailant. Whether the challenge was to her capacity to observe (i.e., she was mistaken) or her truthfulness (i.e., she was lying), or both, the questions implied that the identification of appellant was not trustworthy. The question of whether defense counsel's cross-examination of the victim raised the issue of identity may best be answered with another question: If it was not about identity, what was it about? Defense counsel did not offer the trial court an alternative explanation for his line of questioning, and none is apparent. Counsel simply denied making identity an issue.

*See Page*, 137 S.W.3d at 78–79 (footnote omitted). On this basis, the court of criminal appeals held the complainant had been impeached. *See id.*

Regarding our "material detail" holding, the court of criminal appeals stated:

The Court of Appeals has also read too much into our past pronouncements regarding impeachment relating to a "material detail" of identification. By "material," we have simply meant that the detail must be relevant to the reliability of the identification. In minimizing the

---

1. Former Court of Criminal Appeals Judge Charles F. Baird assigned to this Court by the Chief Justice of the Supreme Court of Texas.

*See* Tex. Gov'T CODE ANN. § 74.003 (Vernon 2005).

impact of the weight discrepancy and in pointing to the strength of the State's other evidence, the Court of Appeals has confused the relevance of the evidence with its strength. That the impeachment was not particularly damaging or effective in light of all the evidence presented is not the question. The question is whether impeachment occurred that raised the issue of identity. If so, Rule 404(b) permits the introduction of extraneous offenses that are relevant to the issue of identity.

*Id.* at 79. Therefore, the court held the impeachment of the complainant related to a "material detail." *Id.*

Rather than simply remand the case to us at this point, the court of criminal appeals provided us with further guidance in the form of footnote 14 which states: "Whether the extraneous offenses were in fact sufficiently similar to show identity was not addressed by the Court of Appeals, and we do not address that question here." *See Lane* [*v. State* ], 933 S.W.2d [504] at 519 [ (Tex.Crim.App.1996) ] ("an extraneous offense must be so similar to the offense charged that the offenses are marked as the accused's handiwork"). *See id.* at 79 n. 14

■ Under *Carroll v. State*, 101 S.W.3d 454 (Tex.Crim.App.2003), courts of appeals are not limited on remand to deciding the pertinent point of error based solely on the explicit basis set out by the court of criminal appeals in its remand order. *See id.* at 459. However, in light of footnote 14, and the fact that the briefs of the State and appellant begin with the issue suggested in footnote 14, namely "whether the extraneous offenses were in fact sufficiently similar to show identity," we will begin our analysis of this case with that issue.

## II. Rule 404(b) and Signature Offenses

■ Under Rule 404(b), extraneous offense evidence may be admissible on the issue of identity. *See* Tex.R. Evid. 404(b). However, the simple fact that identity is at issue does not mean that extraneous offense evidence is *per se* admissible. *Avila v. State*, 18 S.W.3d 736, 740–42 (Tex.App.-San Antonio 2000, no pet.) When an extraneous offense is offered to prove identity, the common characteristics of each offense must be so unusual and distinctive as to constitute the defendant's "signature." *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim.App.1996); *Lane*, 933 S.W.2d at 519.

In *Reyes v. State*, 69 S.W.3d 725 (Tex. App.-Corpus Christi 2002, pet. ref'd), our most recent pronouncement on the subject, we found guidance in *Ford v. State*, 484 S.W.2d 727 (Tex.Crim.App.1972), where the court of criminal appeals recognized that, to some extent, the commission of any particular offense will have some generic qualities. *Reyes*, 69 S.W.3d at 728; *see Ford*, 484 S.W.2d at 730–31. In *Ford*, the court of criminal appeals stated that:

[T]here will always be similarities in the commission of the same type of crime. That is, any case of robbery by firearms is quite likely to have been committed in much the same way as any other. What must be shown to make the evidence of the extraneous crime admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime.

484 S.W.2d at 730–31. Therefore, we concluded that "each case must be measured on its own merits. This measurement must reveal some connective similarity, either in the singular or plural, that rises to the level of a distinguishing characteristic common to both the extraneous offense and the offense charged." *Reyes*, 69 S.W.3d at 738. To make this measure-

ment, we will review the testimony of the complainant and the individuals involved in the two extraneous offenses, and then analyze that testimony to determine if it rises to the level required for admission under Rule 404(b).

### A. The Complainant

In the winter of 1997, the complainant was working as a prostitute in Galveston when appellant pulled up beside her driving a maroon vehicle. When the complainant approached, appellant flashed a badge, said he was a police officer, and instructed the complainant to get into the vehicle. The complainant complied, appellant placed the badge above the sun visor, and the two drove away. Appellant stopped the vehicle, got a police radio from the trunk, and placed it in the back seat. The complainant heard voices from a police radio. Appellant told complainant that it was almost time for his shift change, and he did not want to take the complainant to jail because of the paperwork. Appellant stopped his vehicle a second time and told the complainant she would either have to perform oral sex on appellant or go to jail. Appellant pulled the complainant's head to his exposed penis. The complainant initially performed oral sex on appellant, but stopped and said she would not continue and appellant could take her to jail if he wished. Appellant started his vehicle and returned to the area where he met the complainant. Appellant let the complainant out of the vehicle and told her that she should stay off the streets or she would be arrested by appellant's partners whom he had notified of the complainant.

### B. Erica Cavender [2]

Erica Cavender testified that in the spring of 1997, she was working as a prostitute in Galveston when she was approached by appellant who was driving a maroon vehicle. Appellant identified himself as a police officer, but never exhibited a badge, and asked Cavender to perform oral sex. Cavender heard a "police type radio" in the car. When Cavender asked how much money appellant was willing to pay, he stated that he would pay her six or seven dollars. Cavender refused to perform the sex act for that amount and walked away. Appellant left, only to return and have another conversation with Cavender. At this point, appellant said he would not arrest Cavender if she would go with appellant. Cavender told appellant that she would take her chances, and appellant left.

### C. Angelina Edenfield

Around Labor Day of 1997, Angelina Edenfield was working as a prostitute in Galveston when she was approached by appellant in a maroon vehicle. Appellant asked Edenfield how much she would charge to perform oral sex. Edenfield asked appellant if he was a police officer and appellant answered "No." After the two fondled each other, Edenfield got into appellant's car and they drove to East Beach. Once there, appellant pulled out a badge from the sun visor of his car, and told Edenfield that he was a Texas City police officer working a sting operation in Galveston. Appellant stated that he would not arrest Edenfield if she performed sexual acts for him. Edenfield told appellant to either arrest her or pay her. Appellant became irate and struck Edenfield. At that point, Edenfield became fearful and engaged in oral and vaginal intercourse

---

**2.** It is the author's policy to not refer to complainants by name. However, because of the circumstances presented in this case that policy was not followed on direct appeal and cannot be followed now.

with appellant. Appellant then returned Edenfield to the area where they met.

### D. Analysis

Each of the offenses have the following generic qualities: the females were working as prostitutes in Galveston in 1997, and they involve a male seeking performance of a sex act. The offenses also have several specific qualities. In each instance, appellant identified himself as a peace officer and drove a maroon vehicle. Each time appellant requested oral sex, and threatened to arrest each female if they refused.[3] However, there are many differences which cannot be ignored. For example, in the charged offense appellant did not mention money in exchange for the sex act, but in the offenses involving Cavender and Edenfield, money was discussed.

Additional differences are found when the extraneous offenses are considered individually. The most obvious difference in the Cavender incident and the charged offense is that no sex act was involved. This is a striking dissimilarity when the Cavender extraneous offense evidence was offered, at least in part, to prove the identity of the person who committed a sex act against the complainant. Additionally, with Cavender, appellant identified himself as a peace officer, but he did not display a badge as with the complainant and Edenfield. Cavender did not enter appellant's vehicle. Appellant returned to solicit Cavender a second time, but she again rejected his entreaties. The only similarity the State advances is that both the complainant and Cavender "heard a police radio in the appellant's car." The Cavender incident is so dissimilar to the charged offense that, on this basis alone, we hold the trial judge erred in admitting this extraneous offense evidence.

However, we will continue our analysis, and now consider the Edenfield incident. The State argues this incident is similar to the charged offense because appellant displayed a badge and took both women to "the Seawall area." The first factor is a two-edged sword—while it shows a similarity with the charged offense, it distinguishes the Edenfield incident from the Cavender incident. Regarding the second factor, we do not give weight to the fact that the complainant and Edenfield were taken to "the Seawall area." This, we believe, is a generic quality of prostitution; it is customary after soliciting a prostitute in a public area, for the couple to drive to an isolated area to complete the sex act.

There are additional differences between the Edenfield incident, the charged offense, and the Cavender incident. With Edenfield, appellant initially denied being a peace officer, whereas with the complainant and Cavender, he immediately identified himself as such. Appellant and Edenfield fondled one another prior to her getting into the vehicle. However, there was no fondling in either the charged offense or the Cavender incident. Appellant struck Edenfield, but did not harm or threaten to harm the complainant or Cavender when they rejected him. Finally, unlike the other two situations, there was no police radio in the Edenfield incident. While the facts of the Edenfield incident are closer to the charged offense than the Cavender incident, the decisional authority of this state clearly confirms that close is simply not enough. *Owens v. State*, 827 S.W.2d 911, 915 (Tex.Crim.App.1992). The similarities between the extraneous offense and the charged offense must be so "unusual or idiosyncratic as to signal conclusively that the two offenses were the handiwork of the same individual." *See id.* To hold otherwise would give too

---

**3.** Appellant also engaged in sexual intercourse with Edenfield.

much weight to the generic qualities inherent in the same type of offense, and too little weight to the requirement that the offenses be committed in such a unique and distinctive fashion as to constitute the signature of the defendant. *Ford,* 484 S.W.2d at 730–31.

After carefully analyzing both the similarities and differences between the charged offenses and the two extraneous offenses, we hold the extraneous offenses are not sufficiently similar to identify either of them as the "signature" of appellant. *Reyes,* 69 S.W.3d at 738; *Avila,* 18 S.W.3d at 740–42. Accordingly, the evidence of the Cavender and Edenfield incidents was not admissible under Rule 404(b), and therefore, the trial court abused its discretion in admitting this evidence.[4]

### III. Harm and the Law of the Case

■ On direct appeal, we held that the error in admitting the extraneous offense evidence had a substantial and injurious effect or influence on the jury's verdict under Texas Rule of Appellate Procedure 44.2(b). *Page,* 88 S.W.3d at 766. The State did not petition the court of criminal appeals for review of our decision on the question of harm, and the court of criminal appeals did not address our treatment of the issue of harm on its own motion.

■ The law of the case doctrine provides that an appellate court's resolution of a question of law in a previous appeal of the same case will govern the disposition of the same issue should there be another appeal. *Ware v. State,* 736 S.W.2d 700,

701 (Tex.Crim.App.1987). This is a flexible, court-made doctrine "intended to achieve uniformity of decision as well as judicial economy and efficiency." *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex. 1986). We hold the law of the case doctrine applies to cases on remand when a question of law has previously been settled on direct appeal, unless that question of law has become unsettled by the court's reconsideration on remand.

Assume a court of appeals found an issue was not preserved for appellate review, and the court of criminal appeals subsequently remanded that case to the court of appeals to reconsider the preservation determination. If on remand, the court of appeals determined the issue was preserved, the logical and necessary consequence of that determination would be to address the merits of that argument. However, if on remand the court of appeals reaffirmed its earlier determination that the issue was not preserved for appellate review, that court would not be required to address the merits of a nonpreserved point of error. Our holding will achieve the goals of *Hudson,* that is, uniformity of decision and judicial economy and efficiency.

We now apply this holding to the instant case. On direct appeal we held the trial judge erred in admitting the extraneous offense evidence. The court of criminal appeals remanded the case for reconsideration of that holding only. We have done so, and reach the same conclusion.[5] Consequently, we need not reconsider our previous determination of harm.

---

4. In this context, abuse of discretion does not imply intentional wrong or bad faith, or misconduct, but means only an erroneous conclusion. *Hebert v. State,* 836 S.W.2d 252, 255 (Tex.App.-Houston [1st Dist.] 1992, pet. ref'd) (citing *Webb v. State,* 684 S.W.2d 800, 802 (Tex.App.-Fort Worth 1985, no pet.)).

5. Having determined the extraneous offense evidence was not admissible under Rule 404(b), we need not address appellant Rule 403 argument.

Having fully complied with the remand order of the court of criminal appeals, we again reverse the judgment of the trial court in cause numbers 98CR0911 and 98CR0913 and remand for further proceedings consistent with this opinion.