NUMBER 13-00-303-CR

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG 

 

 

CODY
DEWAYNE MITTEN,                                                            Appellant,

 

                                                             v.

 

THE
STATE OF TEXAS,                                                                  Appellee.

 

 

      On appeal
from the 377th District Court of Victoria County, Texas.

 

 

                                 OPINION
ON REMAND 

 

        Before
Chief Justice Valdez and Justices Yañez and Rodriguez

                                        Opinion
by Justice Yañez

 








A jury found appellant, Cody Dewayne Mitten, guilty
of capital murder,[1]
thereby rejecting his affirmative defense of insanity.  The State elected not to seek the death
penalty, and the trial court assessed punishment at life imprisonment.  In a divided opinion, this Court affirmed the
judgment on direct appeal.[2]  

In a unanimous en banc opinion, however, the
Texas Court of Criminal Appeals held that the trial court erred in admitting a
statement made by appellant at a state hospital during an incompetency
examination.[3]  The court of criminal appeals held that the
statement, introduced by the State to rebut appellant=s insanity defense, was admitted Aon the issue of guilt@ in
violation of section 3(g) of former article 46.02 of the code of criminal
procedure.[4]  The court of criminal appeals vacated our
judgment and remanded the case to this Court for a harm analysis.[5]  We reverse the trial court=s judgment and remand for a new trial.  

                                                               BACKGROUND









At trial, appellant raised the affirmative defense
of insanity.  In his fifth issue,
appellant argued that the trial court erred in admitting, at the
guilt/innocence phase of the trial, a statement he made to John Quinn, Ph.D.,
then chief forensic psychologist at Vernon State Hospital, in the course of Dr.
Quinn=s examination of appellant to determine
competency.  Pursuant to the examination,
Dr. Quinn prepared a report and testified at trial on re-direct examination by
the State regarding the report:   

[Prosecutor]: Now, referring to your report dated 5‑22‑98,
in the same paragraph where we talked earlier about your conclusion or opinion,
that, "The patient" ‑ the patient being Cody Mitten ‑
"is evasive and somewhat manipulative," is it true that that
statement contains a statement, "He is very interested in being found not
guilty by reason of insanity and feels that he will be quickly released into
the community after a few months"?

 

[Dr. Quinn]: Yes.

 

As noted, the court of criminal appeals held that
the trial court erred in admitting the statement because it was introduced to
rebut appellant=s insanity defense and was therefore admitted Aon the issue of guilt@ in
violation of section 3(g) of former article 46.02 of the code of criminal
procedure.[6]  Having determined that the trial court erred
in admitting the statement, we must conduct a harm analysis to determine
whether the error calls for a reversal of the judgment.[7]     

                                                              HARM
ANALYSIS 








We conduct the harm analysis of statutory errors
under Texas Rule of Appellate Procedure 44.2(b), disregarding the error unless
it affected appellant's Asubstantial rights.@[8]  As a general
rule, error in the admission or exclusion of evidence does not rise to a
constitutional level.[9]  With respect to the erroneous admission or
exclusion of evidence, constitutional error is presented only if the correct
ruling was constitutionally required.[10]


At trial, appellant=s
counsel objected to the admission of Dr. Quinn=s
testimony on grounds that it constituted a violation of: (1) former article
46.02, section (g) and (2) appellant=s rights under the Fifth and Sixth Amendments of the
United States Constitution.  It is
unnecessary, however, for us to determine whether the error was constitutional
because even under the less stringent non-constitutional harm standard, we
conclude that the error was harmful. 
Therefore, assuming without deciding, that the error was not
constitutional, we conduct a harm analysis under rule 44.2(b).[11]     

The issue is whether the error in admitting the
evidence of appellant=s statement made during his competency examination
affected a substantial right.[12]  The court of criminal appeals and this Court
have set forth the applicable standard:

Texas Rule of Appellate Procedure 44.2(b) defines
the harm analysis to be used when considering "non‑constitutional"
errors.  We have held that, in applying
Rule 44.2(b), "an appellate court need only determine whether or not the
error affected a substantial right of the defendant. To make this
determination, appellate courts must decide whether the error had a substantial
or injurious affect (sic) on the jury verdict."  We elaborated on this process in Morales
v. State, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000):

 








In
assessing the likelihood that the jury's decision was adversely affected by the
error, the appellate court should consider everything in the record, including
any testimony or physical evidence admitted for the jury's consideration, the nature
of the evidence supporting the verdict, the character of the alleged error and
how it might be considered in connection with other evidence in the case. The
reviewing court might also consider the jury instruction given by the trial
judge, the State's theory and any defensive theories, closing arguments and
even voir dire, if material to appellant's claim.[13]

 

Specifically, the
reviewing court should consider whether the State emphasized the error, whether
the erroneously admitted evidence was cumulative, and whether it was elicited
from an expert.[14]  Evidence of a defendant=s guilt, especially if it is overwhelming, is also a
factor to be considered in conducting a harm analysis.[15]  In determining whether a substantial right
was violated, however, the question is not simply whether there was sufficient
evidence to support the verdict.[16]  








Neither party has the burden of proof under rule
44.2(b).[17]  Rather, the appellate court will examine the
record for purposes of determining harm.[18]  If the error had no influence or only a
slight influence on the verdict, it is harmless.[19]  However, if the reviewing court is unsure
whether the error affected the outcome, the court should treat the error as
harmful, i.e., as having a substantial and injurious effect or influence in
determining the jury=s verdict.[20]

Here, the source of the error was the State.  In its rebuttal case, the State called
Dr.  Quinn to testify regarding his
observations of Mitten at Vernon State Hospital during the several months of
Mitten=s treatment there.[21]  Outside the presence of the jury, the
prosecutor represented to the court that he had Ano
intention of asking anything specifically about insanity or this particular
witness=s opinion about sanity, simply matters addressed in
his report that would bear upon the schizophrenia factor and the mental
illness.@  The trial
court overruled the defense counsel=s objection and allowed the testimony.  

The character of the alleged error, as the
prosecutor conceded at trial, was to offer evidence to rebut Mitten=s insanity defense.[22]  Outside the presence of the jury, the
prosecutor told the court that the evidence Agoes
to the issue of manipulation and whether or not the defendant could have been
manipulating or feigning or basically, asking to be found this way so that he
could avoid responsibility for his actions.@  Thus, as noted by the court of criminal
appeals, the evidence was offered to rebut Mitten=s
insanity defense and was therefore offered on the issue of his guilt, the
central issue in the case.[23]   








The State=s theory was that Mitten was not insane but rather,
in the prosecutor=s words, that he was attempting to Abeat the rap@ by Afaking@ and Amanipulating various people.@  In support
of its contention that A[t]here has been testimony that the defendant was
manipulative,@ the State identified the testimony elicited on
cross-examination from Jeff Janacek, then the officer in charge of the Victoria
County Jail, where Mitten was held.  On
direct examination (by the defense), Janacek testified that during the time
Mitten was incarcerated at the jail, he suffered several possible seizures that
required medical attention.  Janacek also
testified that as a result of a self-inflicted neck wound that was viewed as an
attempted suicide, Mitten was transferred to the hospital for treatment.  On cross-examination, the State introduced
evidence from notes maintained by officers at the jail regarding several
statements reportedly made by Mitten. 
One of the Ajail notes@ reflects that Mitten said to an officer, AI loved my mother to death and I guess I just got
jealous.@  An Aincident report@ reflects that Mitten said to Dr. Robert Lyman, one
of the psychiatrists who conducted a psychiatric evaluation of him, AI don=t know what happened that night.  I=m not a violent person.  You know I loved my mother.  I=m not a personC It was like temporary insanity or something.@  With regard
to Mitten=s hospitalization following his alleged suicide
attempt, the State elicited testimony from Janacek that the incident report
reflects that Mitten was behaving well and in good spirits in the
hospital.  The report also reflects that
during his hospitalization, Mitten was allowed special contact visits from his
family and that family members were allowed to bring him special home-made
food.  According to the report, upon
being told that there was no need for further hospitalization and that he would
be returned to the jail, Mitten=s mood changed dramatically and he asked to see a
doctor.








In its rebuttal case, the State also offered the
testimony of Dr. David Blanchard, an 
emergency-room physician at the hospital in Victoria.  Dr. Blanchard had examined Mitten early in
the evening on the night of the murders, when Candy and Sifford, concerned
about Mitten=s unusual behavior, brought him to the hospital for
examination.  Dr. Blanchard testified
that there were no indications at that time that Mitten was delusional.  He also testified that he saw Mitten again at
the emergency room two days later (after Mitten was arrested for the murders)
when he was brought to the hospital from his jail cell following a possible
seizure.  Dr. Blanchard testified that
Mitten was not delusional and that he was unable to determine whether Mitten
had suffered a seizure.  However, he
testified that Mitten told him that he had deliberately held his breath and
then fallen.

The State also elicited testimony from its own
expert witness, Dr. Richard Coons, a psychiatrist, that he did not believe
Mitten was being candid regarding his memories of the offense.  Dr. Coons testified he had seen Dr. Quinn=s report regarding Mitten being evasive and
manipulative and agreed that some of Mitten=s
behavior was consistent with being evasive or manipulative. 








We next consider whether the erroneously-admitted
statement might have prejudiced the jury=s consideration of the other evidence or
substantially affected their deliberations.[24]  We conclude that Mitten=s statement that he Awas
very interested in being found not guilty by reason of insanity@ was highly prejudicial because it is the only
direct evidence from Mitten arguably supporting the State=s theory that he was feigning mental illness to
avoid a guilty verdict.  Although the
testimony of Janacek and Dr. Blanchard discussed above was offered to support
the State=s malingering theory, it does not directly address the
issue of avoiding a guilty verdict by obtaining a finding of insanity.  Accordingly, we conclude that the
erroneously-admitted statement likely prejudiced the jury=s consideration of the other evidence in the case.

We next address the nature of the evidence
supporting the verdict.[25]  The evidence supporting the jury=s rejection of Mitten=s
insanity defense is far from overwhelming. 
We summarize below the most significant evidence both in support of
Mitten=s insanity defense and the jury=s rejection of it.

The State presented the testimony of two expert witnesses,
Drs. Quinn and Coons.  Dr. Quinn did not
conduct an evaluation to determine whether Mitten was legally insane at the
time of the offense, and therefore did not offer an opinion on the issue of
insanity.  As noted, however, Dr. Quinn
did conduct a competency evaluation of Mitten. 
Pursuant to the competency evaluation, he diagnosed Mitten as suffering
from a brief psychotic disorder with symptoms consistent with those of
schizophrenia.  Dr. Quinn concluded, on
the basis of several tests, that Mitten was not pretending to be mentally ill,
although his report described him as evasive and somewhat manipulative.  The report also contained the
erroneously-admitted statement that Mitten was very interested in being found
not guilty by reason of insanity.  








Dr. Coons conducted a court-ordered insanity
evaluation of Mitten.  He concluded that
there was Asomething wrong@ with Mitten, although he was unable to determine if
it was schizophrenia or some other mental disorder.  Dr. Coons stated he was unable to give an
opinion to a reasonable degree of medical probability as to Mitten=s sanity at the time of the offense.  His 
report noted there was information suggesting Mitten knew his conduct
was wrong.  This information included (1)
typical family behavior just before the murders; (2) an inference that he was
trying to hide his behavior by pulling the phones out of the wall at his mother=s house; and (3) Mitten=s initial exculpatory oral statement claiming
Sifford had stabbed his mother.

The defense presented expert testimony from two
psychiatrists, Drs. Gary Aitcheson and Robert Lyman.  Dr. Aitcheson testified that he conducted an
evaluation to determine whether Mitten was legally insane at the time of the
offense.  As part of the evaluation, he
reviewed, among other things, the psychiatric evaluations of several other
doctors, including Drs. Anthony Hempel and Lyman.  Dr. Aitcheson testified that he concurred
with the conclusion  reached by Drs.
Hempel and Lyman that Mitten was legally insane at the time of the
offense.  Dr. Aitcheson testified he also
reviewed the report of Dr. Quinn=s competency evaluation, which contained Mitten=s statement that he was very interested in being
found not guilty by reason of insanity. 
Dr. Aitcheson also testified that he was Aconvinced
within a reasonable degree of medical certainty@ that
Mitten was not malingering or Afaking@ his illness. 
On cross-examination by the State, Dr. Aitcheson confirmed that an
incident report from the Victoria County Jail reflected that Mitten had said he
resented Sifford for coming  between him
and his mother.  

Dr. Lyman testified he performed a psychiatric
evaluation of Mitten to determine if he was competent to stand trial and
whether he was legally insane at the time of the offense.  He testified that Mitten was suffering from a
major mental illness at the time of the offense and did not know the
wrongfulness of his actions.  Dr. Lyman
also testified that Mitten was not faking his illness.    








Two San Antonio police officers, Larry DeHaven and
Edward Giddings, testified that Mitten initially gave two exculpatory versions
of what happened before he admitted killing both victims.  Another officer testified that at the police
station, when making telephone calls, Mitten wrapped the phone in his shirt as
if he did not want to leave his fingerprints on it.  Various members of Mitten=s family testified regarding instances of his
bizarre behavior in the weeks preceding the murders, including delusions that
he was the Holy Spirit.  

We next address whether the State emphasized the
error.[26]  After reviewing the record, we conclude that
the erroneously-admitted statement was heavily emphasized by the State.  The State elicited testimony regarding Mitten=s statement from three different witnesses: Drs.
Aitcheson, Quinn, and Coons.  The first
occasion occurred during the State=s cross-examination of Dr. Aitcheson, a defense witness.  The following exchange occurred:

Q [by prosecutor]: Now, you had indicated in your
testimony, sir, with regard to Dr. Quinn, that Dr. Quinn did not find that Cody
Mitten was faking or malingering; is that correct, sir?

 

A [Dr. Aitcheson]: Correct.

 

Q: And you, again, have read Dr. Quinn=s report and you are familiar with that report; is
that correct?

 

A: Yes, it is. (sic)[27]


 








Q:
Is it correct that Dr. Quinn in his report states, AThe patient is evasive and somewhat
manipulative.  He is very interested in
being found not guilty by reason of insanity and feels he will be quickly
released to the community after a period of a few months@?

 

A:
I recall him writing something of that sort, yes.  

 

Two days later, during
the State=s rebuttal case, the State called Dr. Quinn as a
witness.  The trial court overruled
defense counsel=s objection and erroneously allowed Dr. Quinn to
testify regarding his report, which contained Mitten=s statement. 

After Dr. Quinn
concluded his testimony, the State called Dr. Coons as a witness.  The State elicited the following testimony:

Q
[prosecutor]: All right.  Now, did you
have an opportunity, Doctor, as part of the evaluation process, to review a
report by Dr. Quinn, at Vernon State Hospital?

 

A
[Coons]: Yes.

 

Q:
All right.  And are you aware of a
statement that Dr. Quinn made in his report regarding the defendant, Cody
Mitten, being evasive and manipulative?

 

A:
Yes.

 

Q:
Based on your interview with Cody Mitten, did you concur with the feelings that
there were some signs of manipulative or evasive behavior?

 

A:
As I stated before, I don=t believe he was being square with me about what his
full memory was.

 

Q:
All right.

 

A:
And that would be consistent with being evasive or manipulative. 

 

.
. . .

 

Q:
All right.  And are you also aware, in
regard to the report from Dr. Quinn, that the defendant had told Dr. Quinn that
he, being the defendant, Cody Mitten, was very interested in being found not
guilty by reason of insanity and felt he would be quickly released into the
community after a few months?

 

A:
Yes, sir.

 








During its closing argument, the State directed the
jury=s attention to the Areal
crux of the matter,@ Mitten=s insanity defense. 
The prosecutor argued as follows:

[Prosecutor]: . . . Now, let=s talk a moment about the testimony of Dr.
Quinn.  Recall his testimony.  Defendant remarks to him during their
interview, the defendant was veryC Not street legal, not a little bit, but very
interested in being found not guilty by reason of insanity and the defendant
believed he would be quickly released back into the community.  He was evasive and manipulative.

 

If you recall the testimony from Captain Janacek
regarding some of the incidents from the jail, I think it was very clear that
the defendant was manipulative.  He kept
doing things to get himself out of isolation, to the point of trying to make
some attempts, perhaps, of trying to take his life.  We don=t know how legitimate that attempt was.  It got him out of the jail and, for the first
time, he got contact with his family, special food brought in, homemade
enchiladas from his grandmother.  His
mood was very good, very upbeat.

 

Then the doctor from Gulf Bend comes in.  AAnything you want to tell me, Cody?  No, I have nothing to tell you.@  Then he
finds out later that day he=s going to be taken back to jail.  Guess what happens?  His mood changes dramatically.  He wants to talk to the doctor from Gulf Bend
because he=s got something to tell him.  Manipulative, ladies and gentlemen.  Manipulative. 

 

. . . . 

 

Dr. Coons also testified, ladies and gentlemen, that
he had heard and read the comments that the defendant made to Dr. Quinn about
being releasedC about being found not guilty by reason of insanity
and about being released back in the community. 
And you=ll recall Dr. Coons isC
Remember, he=s done thousands of these.  He doesn=t recall a case where an individual came in and started
talking to him about, AThe different kind of pleas I can enter in my case,@ but Cody Mitten did.  

 

. . . .

 

Please, ladies and gentlemen, don=t let him fool you, return a verdict of guilty of
capital murder.

 








The State thus brought the erroneously-admitted
statement to the jury=s attention three times during the trial and
referred to it several times during closing argument.  The prosecutor=s plea
that the jurors not allow themselves to be Afooled@ by Mitten=s Amanipulative@ conduct was the last argument the jurors heard
before retiring to deliberate.  We
conclude the State relied heavily on the erroneously-admitted statement. 

We must also consider whether the evidence was Aelicited from an expert.@[28]  Here, Mitten=s statement was elicited from one of the State=s experts, Dr. Quinn.  The State compounded the effect of the
statement by eliciting testimony from two other experts, Drs. Coons and
Aitcheson, that they also had reviewed the statement in Dr. Quinn=s report.  
Moreover, as noted above, the State emphasized in closing that even
though Dr. Coons had done Athousands@ of psychiatric evaluations, he did not recall any
other instance in which a defendant had discussed with him the potential pleas
that might be entered.   








We next address whether the evidence in question was
Acumulative.@[29]  We do not
believe Dr. Quinn=s testimony regarding Mitten=s statement was cumulative.  Although both Drs. Aitcheson and Coons
testified regarding the same statement, their testimony derived solely from the
fact that they had reviewed Dr. Quinn=s report containing the statement.  Although the focus of the State=s theory was Adon=t let him fool you,@ the
only other direct evidence supporting the State=s
manipulation theory was Janacek=s testimony suggesting Mitten may have feigned a
seizure to obtain the comforts and privileges of being in the hospital and Dr.
Blanchard=s testimony that Mitten said he deliberately held
his breath and fell.  The force of
Janacek=s testimony was tempered somewhat by his testimony
on re-direct examination by the defense, in which he confirmed incident reports
describing Mitten as sobbing uncontrollably, Anervous
and unable to sleep,@ Aat a breaking point,@ and Abanging his head on the cell and yelling that his
life had been set in stone and predetermined by a [greater] power.@  The effect
of Mitten=s statement that he was Avery interested in being found not guilty by reason
of insanity and feels that he will be quickly released into the community after
a few months@ almost certainly tipped the balance in the State=s favor.

Finally, we must consider whether admission of the
erroneously-admitted statement was rendered harmless because evidence of the
same statement was introduced, without objection, through the testimony of Drs.
Aitcheson and Coons.  We recognize the
well-established rule that any error in admitting evidence over a proper
objection is harmless if the same evidence is subsequently admitted without
objection.[30]  More specifically, in the context of
erroneous admission of an appellant=s statement made during a competency evaluation in
violation of former article 46.02 (3)(g) of the code of criminal procedure, the
court of criminal appeals has held that such error may be rendered harmless
where an appellant confesses to the same facts as were testified to by the
State=s witness.[31]  In Caballero, the court of criminal
appeals relied on two earlier cases in which it found such error harmless
because the appellant had admitted making the statement:








The
admission of the statement was clearly error. 
Although appellant did not object to the admission of the statement,
this Court has held that the error cannot be waived because the statute is too
clear and absolute to be held subject to waiver.  Ballard v. State, 519 S.W.2d 426 (Tex.
Cr. App.1975, Opinion on Appellant's Motion for Rehearing).  It was pointed out in Ballard,
however, that "such an error may be rendered harmless, as when the accused
admits the making of the statements." 
In Smith v. State, 502 S.W.2d 814 (Tex. Cr. App.1973), cited in Ballard,
the admission of an incriminating statement made by the defendant during a
psychiatric examination was found to be harmless error because the same
statements were made in appellant's written confession which was admitted in
evidence. In this case, as in Smith, appellant confessed to the same
facts as were testified to by the State's witness.[32]


 

We find the
circumstances in the present case distinguishable from those in Caballero,
Ballard,[33]
and Smith.[34]  In Smith, the statement at issue
was the appellant=s statement that he shot his wife and killed her.[35]
 The appellant subsequently signed a
written confession admitting the crime.[36]  Similarly, in Caballero, the statement
at issue was the appellant=s statement that he wanted to kill his wife and her
boyfriend.[37]  The appellant subsequently signed two
statements in which he admitted killing his wife.[38]  








In the present case, absent Mitten=s statement, there was little other evidence to
support the State=s theory that he was feigning insanity to avoid a
guilty verdict.  The statement was the
strongest evidence supporting the State=s theory. Three expert witnesses testified regarding
the same erroneously-admitted statement. 
We conclude that it is very probable that the jury relied heavily on the
statement in rejecting Mitten=s insanity defense.

Keeping in mind that we should treat the error as
harmful if we are unsure whether it affected the outcome,[39]
and applying the harm analysis required in rule 44.2(b), we do not have fair
assurance that the trial court=s error in admitting the evidence had no, or but a
slight, effect on the jury=s finding of guilt.[40]  Accordingly, we hold that the error was
harmful and reverse and remand for a new trial.   

 

                                                              
                                                       

LINDA REYNA YAÑEZ

Justice

 

 

 

Publish.  

Tex. R. App. P.
47.2(b).

 

Opinion
on remand delivered and 

filed
this the 30th day of June, 2005.

 

            

 











[1]
Appellant was charged with
capital murder pursuant to section 19.03(a)(7)(A) of the Texas Penal Code.  See Tex.
Pen. Code Ann. ' 19.03(a)(7)(A) (Vernon Supp.
2005).  The indictment alleged that
during the same criminal transaction, appellant murdered more than one person:
his mother, Candelaria (ACandy@) Mitten and Larry Allen Sifford,
by stabbing each with a knife.





[2]
Mitten v. State, 79 S.W.3d 751, 756 (Tex. App.BCorpus Christi 2002) (en banc), vacated
and remanded, 145 S.W.3d 225, 228 (Tex. Crim. App. 2004) (en banc).  In our opinion dated June 13, 2002, we
overruled appellant=s six issues and affirmed the trial
court=s judgment.  





[3]
Mitten v. State, 145 S.W.3d 225, 228 (Tex. Crim.
App. 2004) (en banc).





[4]
Id.; see Act of June 15, 1977,
65th Leg., R.S., ch. 596, ' 1, art. 46.02, sec. 3(g), 1977 Tex. Gen. Laws 1458, 1460, repealed
by Act of May 14, 2003, 78th Leg., R.S., ch. 35, ' 15, 2003 Tex. Gen. Laws 57, 72
(current statute at Tex. Code Crim.
Proc. Ann. art. 46B.007 (Vernon Supp. 2004-05)).  Former article 46.02, section 3(g)
of the code of criminal procedure provided: "No statement made by the
defendant during the examination or hearing on his competency to stand trial
may be admitted in evidence against the defendant on the issue of guilt in any
criminal proceeding."  The current
statute, which became effective January 1, 2004, says that a statement made by
a defendant during an examination on competency Amay not be admitted in evidence
against the defendant in any criminal proceeding.@ 
Tex. Code Crim. Proc. Ann. art.
46B.007 (Vernon Supp. 2004-05).  The term
Aon the issue of guilt@ is not in the new statute.  See id.; Mitten 145 S.W.3d at
227-28.      





[5]
Mitten, 145 S.W.3d at 228.





[6]
Id. 





[7]
Tex.
R. App. P. 44.2.  





[8]
See Burnett v. State, 88 S.W.3d 633, 637 (Tex. Crim.
App. 2002); see also Tex. R. App.
P. 44.2(b). 





[9]
Arzaga v. State, 86 S.W.3d 767, 776 (Tex. App.BEl Paso 2002, no pet.); Reyes v.
State, 69 S.W.3d 725, 742 (Tex. App.BCorpus Christi 2002, pet. ref=d) (noting rule 44.2(b) applicable
for error stemming from erroneous admission of extraneous offense evidence); see
Bagheri v. State, 119 S.W.3d 755, 762-63 (Tex. Crim. App. 2003) (quoting
Potier v. State, 68 S.W.3d 657, 662-63 (Tex. Crim. App. 2002) (AErroneous evidentiary rulings
rarely rise to the level of denying the fundamental constitutional rights. . .
.@)). 





[10]
Tate v. State, 988 S.W.2d 887, 890 (Tex. App.BAustin 1999, pet. ref=d). 





[11]
See Tex. R.
App. P. 44.2(b).





[12]  See id.; Nonn v. State, 117 S.W.3d
874, 881 (Tex. Crim. App. 2003).





[13]
Nonn, 117 S.W.3d at 881 (footnotes and
internal citations omitted); see Salazar v. State, 118 S.W.3d 880,
882-83 (Tex. App.BCorpus Christi 2003, no pet.)
(opinion on remand); Reyes v. State, 69 S.W.3d 725, 742 (Tex. App.BCorpus Christi 2002, pet. ref=d).   





[14]
Bagheri, 119 S.W3d at 763 (citing Motilla
v. State, 78 S.W.3d 352, 356 (Tex. Crim. App. 2002); Solomon v. State,
49 S.W.3d 356, 365 (Tex. Crim. App. 2001)).   






[15]
Motilla, 78 S.W.3d at 358.





[16]
Bagheri, 119 S.W.3d at 763. 





[17]
Reyes, 69 S.W.3d at 742.   





[18]
Id.  





[19]
Id.  





[20]
Id.  





[21]
After a jury determined
Mitten was incompetent, he was transferred to Vernon State Hospital for further
examination and treatment with the specific objective of obtaining competency.





[22]
See Mitten, 145 S.W.3d at 227.





[23]
Id. at 228.





[24]
See Bagheri, 119 S.W.3d at 764.  





[25]
See id. 






[26]
See Bagheri, 119 S.W.3d at 763.





[27]
Designation of A(sic)@ appears in the reporter=s record.





[28]
See Bagheri, 119 S.W.3d at 763.  





[29]
See id.  





[30]
Chamberlain v. State, 998 S.W.2d 230, 235 (Tex. Crim.
App. 1999).





[31]
Caballero v. State, 587 S.W.2d 741, 743 (Tex. Crim.
App. 1979).  





[32]
Id. 






[33]
Ballard v. State, 519 S.W.2d 426, 429 (Tex. Crim.
App. 1975).  In Ballard, a
psychiatrist who had examined the defendant was permitted, over objection, to
testify at the guilt stage of the trial to statements made by the defendant
during the examination which were inconsistent with the defendant's
testimony.  Id. at 428.  It was held that such testimony by the
psychiatrist was in violation of the express provisions of former article
46.02.  Id. at 429.





[34]
Smith v. State, 502 S.W.2d 814 (Tex. Crim. App.
1973).  





[35] Id. at 815.





[36]
Id. at 816.





[37]
Caballero, 587 S.W.2d at 743.





[38]
Id. 





[39]
Reyes, 69 S.W.3d at 742.





[40]
See Tex. R.
App. P. 44.2(b).