

# NUMBER 13-18-00052-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI–EDINBURG

---

**MARCUS MARQUIS MOSELEY,**                                                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                                         **Appellee.**

---

### On appeal from the 272nd District Court
### of Brazos County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Perkes
### Memorandum Opinion by Justice Perkes

A jury convicted appellant Marcus Marquis Moseley of aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.021(a)(2)(B). The trial court assessed punishment at forty-five years' confinement in the Institutional Division of the Texas Department of Criminal Justice. *See* TEX. PENAL CODE ANN.

§ 12.32. By two issues, Moseley argues that the trial court committed reversible error by admitting testimony of: (1) extraneous unadjudicated offenses, and (2) out-of-court statements. We affirm.[1]

## I. BACKGROUND

Moseley was charged with aggravated sexual assault of a child against A.H.[2] Prior to trial, the State provided notice that it sought to include evidence of sexual assaults involving four unrelated minor females: B.B., M.F., I.W., and C.J. The trial court determined testimony from I.W. and C.J. would be admitted following an article 38.37 hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37 § 2(1)(E) (providing for the use of extraneous-offense evidence in the prosecution of certain offenses).

During opening statements at trial, the State stated that the evidence would show that by the time A.H. was "molested by this Defendant, . . . [he] had molested other little girls in the same house under similar circumstances." Moseley also made his theory of the case known: "Everybody has a motivation to lie. Everyone has a motivation to collude with people that they know in order to make someone look worse."

### A. Testimony Regarding A.H.'s Allegations

A.H.'s father was the State's first witness. He testified A.H. was twelve years old when she came into his bedroom one evening "not acting herself" and crying. A.H. was reluctant to say what was wrong. "She had tears in her eyes, and I asked her. I said:

---

[1] Pursuant to a docket-equalization order issued by the Supreme Court of Texas, the appeal has been transferred to this Court from the Tenth Court of Appeals in Waco, Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] We use initials to refer to minors in sexual assault cases to protect their privacy. *See* TEX. R. APP. P. 9.8 cmt. ("The rule [protecting the privacy for filed documents in civil cases] does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

[']You can tell me anything.[']" A.H. told her father that several months earlier, she had been sexually assaulted during a sleepover at the neighbor's house. He said his daughter told him that "she was woken up to him on top of her." A.H. could not remember the name of the man who assaulted her and instead provided her father with a description. He testified that based on the description, he identified Moseley as the offender. "I knew who she was talking about because the gentleman in question came to my house several times." Moseley's mother, Janette Moseley, resided in the house across the street, where Moseley often stayed and where A.H. and her sister would go over to play and spend the night.

A.H., an eighth grader at the time of trial, testified that she and her sister were spending the night at a neighbor's house in the summer of 2015, when "[he] came in." He wore "a white shirt, blue do-rag and black jeans with some stuff at the back." While other neighborhood children slept on a nearby couch, Moseley dropped his pants and laid down beside A.H. on the floor. A.H. said he pulled down her red pajama shorts. When asked by the State if Moseley's penis made contact with her vagina, she answered in the affirmative, but denied that "his private part went inside." A.H. said when Moseley was done, he got up and left the house. The next morning, her sister found her lying down with her legs "gapped open" and crying. A.H. stated she had initially been afraid to tell her parents in fear that she would get in trouble, and she only outcried to her father after watching a video at school "about not to be afraid to tell your parents anything." A.H. denied knowing C.J. and I.W.

Moseley questioned A.H. on cross examination regarding purported factual and logical inconsistencies of her statements, occupying over fifty pages of the record.

3

Q. And you testified earlier that when he started touching you that you were still kind of asleep; is that right?

A. Yes, sir.

Q. All right. And so you don't know when he came into the room, did you?

A. No.

. . . .

Q. Okay. And how—how did he try—describe to the jury how he tried to penetrate you when you were on your back?

A. He—I don't know.

. . . .

Q. Okay. Do you remember telling [the forensic interviewer] something different?

A. No.

Q. You don't remember telling her that he tried to penetrate you on the front first and then from behind?

A. No.

. . . .

Q. And I noticed that you've had some different explanations or memories that you shared with [the forensic interviewer], that you shared with the jury, that you shared with [the State], and that you've shared with me. You understand all those—all those stories are different; is that right?

A. I guess.

Q. Well, you would know. You said them. Are all those stories different?

A. No, they're still the same.

Q. They're still the same. Okay.

4

. . . .

Q. Okay. So what—it's either what you told [the State], when she was questioning you, or what you told me when I was questioning you. I asked you just a minute ago: Final answer. Did you know if it was a penis that touched you? And you said: No. Then [the State] asked you, and you said: No, it was a penis. Ma'am, telling the truth right here, do you want to change your final answer?

A. Yeah.

Q. You do want to change your final answer? Okay. And I see you smiling now; is that right?

Q. Okay. So you were lying when you told me final answer that he didn't touch you with his penis; is that right?

A. I guess.

. . . .

Q. Why did you feel like you could lie here today?

A. I'm not lying.

Moseley's accusations that A.H. was fabricating her claims continued in his cross-examination of Cameron Collins, a child advocacy center forensic interviewer, who testified next.

Q. Her testimony initially was that [Moseley] came over to drop [his] child off at 2:00 or 3:00 at night?

A. Yes, sir.

Q. While the girls were playing video games?

A. I believe that's correct.

Q. And then she said later, about 17 and a half minutes in, that [Moseley] came back about 1:00 o'clock in the morning; is that correct?

5

A.    That's correct.

Q.    And that they were all asleep when he came back; is that right?

A.    Correct.

Q.    She also told you that she saw him remove his pants and his drawers; is that correct?

A.    I believe—I may have that wrong.  I believe she said, you know, pulled them down.

Q.    Okay.  But she also told you that she started feeling it, and you— "it" you identified as a dick later.  Then she woke up; is that correct?

A.    I recall her saying that she woke up to feeling—feeling it.

. . . .

Q.    And from your interview, did you understand that the first attempt at penetration was genital penetration and then anal penetration?

A.    That was my understanding, yes, sir.

Collins maintained that it was not her "role" to "make the determination" of whether or not a child is "lying."  She testified to the "stages of disclosure" and the normalness of a delayed disclosure.  Against Moseley's objections, the State introduced into evidence a recording of Collins's thirty-minute interview with A.H.

Moseley's niece, K.M., who was friends with A.H. and lived across the street in Moseley's mother's home, testified she remembered A.H. spending the night.  According to K.M., the girls always slept in the same room together.  K.M. testified that she did not believe A.H.'s allegations against her uncle.

After witnesses familiar with A.H. testified, the trial court permitted the State to present the extraneous-offense evidence during its case-in-chief involving I.W. and C.J., two unrelated minor females.

6

**B.      Testimony Regarding I.W.'s Allegations**

I.W., who was seventeen at trial, testified that Moseley sexually assaulted her when she was between the ages of six and eight.   Moseley was in his early twenties at the time.   I.W. explained that Moseley was her "mom's best friend's brother," so she knew who he was, and she frequented Moseley's mother's home as a child.   On one occasion, I.W. testified that she was playing a video game upstairs with several other children when Moseley asked her to go over to him so he could "tickle her."   Moseley quickly became impatient and "made [the other children] leave."   I.W.'s older sister was the last one to exit the room.   When her sister "tried to get back in" to take I.W. with her, Moseley shut the door.

I.W. testified that tickling around her breasts progressed to kissing and taking off her clothing.   Moseley then laid her on an ironing board and proceeded to kiss her "from [her] face, then down to [her] vagina."   I.W. stated that Moseley attempted to "force" his penis into her vagina.   It was "painful" and "didn't work."   When Moseley was done, he helped dress her and told her if she told anyone, "[she'd] get in trouble."   At the next available opportunity, I.W. ran downstairs and confided in her sister, who convinced her to tell their mother.   I.W. and her sister never visited Moseley's home again.   I.W. testified that she did not know anyone by the name of A.H. or C.J.

Moseley questioned I.W. regarding the positioning of the ironing board, her placement, Moseley's placement, and the plausibility of I.W.'s testimony.

> Q.      Was [the ironing board]—do you think it was made out of aluminum, or was it made out of steel?   Was it a strong material that it was made out of?

7

A.    It was strong material.   Well, it—what [sic] you mean?   Like the top or the whole thing?

Q.    I mean, the whole thing.

A.    I don't know.

Q.    Such that it would support a seven-year-old

A.    So it got [sic] to be strong to hold me on there.

. . . .

Q.    Okay.   And if you're laying on there and it's 3 feet up, how did he attempt to penetrate you?

A.    I mean—

Q.    Did he get up on the ironing board?

A.    No, it was like kind of—it was to his belly button.   Like that's how tall it was like, like kind of—not to his belly button, but probably a little under his belly button.   But it was like near by his belly button.   Like that's how tall it was compared to him.

. . . .

Q.    Are you laying on the long side or on the short side, length or width?

A.    I was kind of—well, this way; but I was kind of like at the kind of end of the ironing board.

. . . .

Q.    —but if I were to lay on the table the way you were laying on that ironing board, would I be laying this direction; or would I be laying the second direction?   Long way or width way?

A.    Long way.

Q.    Okay.   And so if he was attempting to penetrate you, he would be standing at this end; is that correct?

A.    Yes, sir.

8

. . . .

Q.     Okay. Would you agree with me that this level right here on this area, this shelf in front of Judge Bryan's bench is about the height of a[n] ironing board?

A.     Uh-huh.

Q.     Okay. And so if you're laying with your head about here?

A.     Uh-huh.

Q.     And your legs right here?

A.     Uh-huh.

Q.     And he's trying to penetrate you—

A.     Uh-huh.

Q.     —is it going to be possible for him to penetrate you?

A.     Yeah, if he did it. So if he pulled me closer to him, yes.

After several minutes of demonstrative-based questioning by Moseley's counsel, I.W. said, "I'm sorry. I don't want to do this no [sic] more. I'm not going to talk about it." The trial court permitted a short break before questioning resumed. I.W. was unable to identify Moseley in the courtroom.

Noberto Omar Espitia, an assistant principal at I.W.'s high school, spoke to I.W.'s reaction when she was first contacted by the State. Espitia was present during I.W.'s interview with the State, which took place during the lunch hour at school. Espitia said I.W. was called to the principal's office, unaware of the reason why. When the State asked I.W. if she knew "Marcus Moseley," I.W. appeared to recognize the name. "She seemed very surprised. . . . I could tell that she did not know why she was there. She was kind—you could see she was kind of trying to put the pieces together." Espitia was

9

unable to recall many of the details of the assault that I.W. shared during the course of the meeting, but testified, "[T]here was [sic] some graphic details that she gave." Against Moseley's objection to hearsay, Espitia testified that I.W. told them that her mother had left her in Moseley's care, other children were initially present but "had been taken out of the room," and "she was around six to seven, maybe eight" when the assault occurred.[3]

I.W.'s mother, Taronsila Roberson, testified that she remembered leaving her daughters with Moseley's mother, Janette. Moseley's sister's children were also in the home. When I.W. told her that Moseley had touched her, I.W. did not provide any details. However, Roberson recalled immediately "check[ing]" her daughter's "private area" and noticing that I.W. did not have any underwear on. Roberson found I.W.'s underwear in Moseley's washing machine and said that Janette was unable to provide any information regarding how I.W.'s underwear ended up in the washer or why I.W.'s underwear required cleaning. "I was upset, but I tried to keep my composure for my kids' sake," she said. Within the week, Roberson took her daughter to her physician. She testified that the doctor told her that based on his physical examination of I.W., "[I.W.] hadn't been touched[,]" so she declined to involve law enforcement.

## C. C.J.'s Testimony

The State next called twenty-two-year-old C.J. C.J. knew Moseley because he had a child with C.J.'s aunt. C.J. testified that the abuse began when she was ten years old up until she was thirteen. C.J. recalled being in the living room at Moseley's mother's house: "He was supposed to be helping me take the braids out of my hair. And he then

---

[3] The State's investigator, Michael Johse, was also present during the interview and testified at trial regarding his recollection of events—also against Moseley's objection to hearsay.

started feeling on me." Moseley instructed her to "be quiet" as he touched her vaginal area and attempted to anally penetrate her with his penis. "I keep [sic] saying no," C.J. said, "and then he went into my front area."

According to C.J., the sexual abuse was "continuous," with vaginal penetration occurring on four or five more occasions until a cousin "walked in and caught him; and then that's when it had got back to [her] mom." C.J. said she had told her mother after the first incident, and her mother "beat" her in response. Although C.J. was ten years old at the time, her mother considered the sex consensual. "[S]he told my aunt that I was just trying to mess with her baby daddy." C.J. was able to identify Moseley in the courtroom. She testified that she was unaware of who A.H. or I.W. were.

## D. Defense's Case-in-Chief

Janette was the sole witness in the defense's case-in-chief. Janette testified her son stayed periodically with her "in '15," the year the alleged offense occurred. Janette opined that although she kept an ironing board in her home, it could not hold the weight of a six-year-old. Janette recalled A.H. and her sister spending the night at her residence but denied witnessing any evidence of the allegations against Moseley.

Moseley's counsel argued in closing arguments, as he did in his opening statements, that A.H. and "the rest of these alleged victims" were being dishonest at his client's expense:

> [A.H. is] a liar. She admitted that she is a liar. . . . [I.W.] is another one who doesn't know the truth. . . . She asked you to defy basis [sic] laws of physical impossibility. . . . Then you've got [C.J.]. And I'll be frank with you. I don't have the explanation. I don't have the inconsistencies with [C.J.] that there are with the alleged victim and then these other people who come in. Why was [C.J.] here? . . . What ax did she have to grind?

11

The jury returned a guilty verdict, and the trial court assessed punishment. This appeal followed.

## II. ADMISSION OF EXTRANEOUS-OFFENSE EVIDENCE

By his first issue, Moseley contends that the trial court erroneously admitted I.W.'s and C.J.'s testimony under article 38.37 of the Texas Code of Criminal Procedure and Rule 403 of the Texas Rules of Evidence. TEX. CODE CRIM. PROC. ANN. art. 38.37 § 2; TEX. R. EVID. 403.

### A. Standard of Review

We review a trial court's decision on admissibility of extraneous-offense evidence under an abuse of discretion standard. *Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016) (citing *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001)). We will uphold a trial court's admissibility decision when that decision is within the zone of reasonable disagreement and as long as it is correct on any theory of law applicable to the case. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018); *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).

### B. Applicable Law

Article 38.37 of the code of criminal procedure permits the admission of evidence of other sex crimes committed by the defendant against children—other than the complaining witness of the alleged offense—"for any bearing the evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant." TEX. CODE CRIM. PROC. ANN. art. 38.37 § 2(2)(b). Extraneous-offense evidence can also be admitted to rebut the defensive theory of fabrication. *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008); *see*

12

*also Dabney*, 492 S.W.3d at 317 ("Because Appellant presented his defensive theory in opening statements, the State could use extraneous-offense evidence to rebut this theory in its case-in-chief rather than waiting until the defense rested.").

Before extraneous-offense evidence may be admitted under article 38.37, the trial court is required to determine that "the defendant committed the separate offense beyond a reasonable doubt." TEX. CODE CRIM. PROC. ANN. art. 38.37 § 2-a(1)(2); *Lopez v. State*, 288 S.W.3d 148, 165 (Tex. App.—Corpus Christi–Edinburg 2009, pet. ref'd). Further, upon proper objection or request, the trial court is also required to conduct a Rule 403 balancing test to consider whether the value of the evidence is substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403; *see also Distefano v. State*, 532 S.W.3d 25, 31 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd); *Davila v. State*, No. 13-18-00298-CR, 2019 WL 3227263, at *2 (Tex. App.—Corpus Christi–Edinburg July 18, 2019, no pet. h.) (mem. op., not designated for publication). A Rule 403 analysis requires consideration of the following:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). In overruling a Rule 403 objection, the trial court is presumed to have applied a Rule 403 balancing test and to have determined that the evidence was admissible. *See Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd); *see also Distefano*, 532 S.W.3d at 31

(providing that Rule 403 does not require that the balancing test be performed on the record).

**C.      Article 38.37 Analysis**

Moseley first asserts that he did not open the door for the use of the extraneous-offense evidence to rebut a defense of fabrication and alternatively that I.W.'s testimony does not meet admissibility requirements under article 38.37.[4]   We disagree.

Moseley's defensive theory of fabrication was consistent and prevalent:   first appearing in his opening statements, then throughout his cross-examination when he repeatedly accused A.H. of lying, and re-affirmed in his closing arguments when he pointedly said, "[A.H. is] a liar."   *See Dabney*, 492 S.W.3d at 317; *Bass*, 270 S.W.3d at 563; *see, e.g., Webb v. State*, 575 S.W.3d 905, 909 (Tex. App.—Waco 2019, no pet. h.) (holding that appellant "open[ed] the door" to the use of extraneous-offense evidence when "defense counsel asked a series of questions designed to suggest that [the complaining witness] was lying or changed her story regarding various facts pertaining to the incident.").

With respect to his contention that I.W.'s testimony fell short of requirements under article 38.37, Moseley argues that I.W. was unable to visually identify him in the courtroom as her assailant and that "the mechanics of the assault" she alleged were improbable. However, the weight to be assessed to witness testimony in an article 38.37 hearing rests with the trial court.   *See Ryder v. State*, 514 S.W.3d 391, 399 (Tex. App.—Amarillo 2017,

---

[4] We note that although Moseley states in his brief that "the trial court committed reversible error by allowing witnesses I.W. and C.J. to testify under article 38.37 . . .[,]" Moseley makes no specific arguments regarding C.J.'s testimony under article 38.37, instead applying only the Rule 403 balancing test.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.37 § 2; TEX. R. EVID. 403.   Therefore, our 38.37 analysis is limited to I.W.'s testimony.

pet. ref'd) (admissibility of witness's testimony about extraneous offense did not violate article 38.37 because admissibility of testimony turned on trial court's assessment of witness's credibility and weight to be given evidence); *see also Shukla v. State*, No. 01-18-00147-CR, 2019 WL 2621737, at *8 (Tex. App.—Houston [1st Dist.] June 27, 2019, no pet. h.) (mem. op., not designated for publication) (same); *White v. State*, No. 03-17-00504-CR, 2019 WL 2518755, at *8 (Tex. App.—Austin June 19, 2019, no pet. h.) (mem. op., not designated for publication) (same). The trial court's assessment of a witness's credibility extends to a witness's inability to make an in-court identification of a defendant. *See Chafer v. State*, 500 S.W.2d 139, 141 (Tex. Crim. App. 1973) (affirming conviction based on testimony where the complaining witness could not identify the defendant in-court); *Moore v. State*, 140 S.W.3d 720, 727 (Tex. App.—Austin 2004, pet. ref'd) (same). Here, the trial court judged I.W.'s credibility and found her statements credible irrespective of Moseley's implausibility argument and I.W.'s inability to identify Moseley in-court.

Viewing the record in the proper context and remaining mindful of the deference we provide the trial court on rulings of admissibility of extraneous-offense evidence, we cannot conclude that the trial court's ruling fell outside the "zone of reasonable disagreement." *Gonzalez,* 544 S.W.3d at 370.

**D.    Rule 403 Analysis**

In conjunction with his article 38.37 argument, Moseley contends that the "extraneous offense testimony failed to meet" each Rule 403 balancing requirement. We next consider and apply the facts of this case to the aforementioned factors, noting that "these factors . . . blend together in practice." *Gigliobianco*, 210 S.W.3d at 642.

15

### 1.  Probative Value and Proponent's Need for Evidence

"Probative value" is the measure of "how strongly [the evidence] serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence."  *Id.* at 641.  We acknowledge that testimony regarding sexual assault involving children by its nature tends to be inflammatory, and the length of time can diminish the probative value of extraneous-offense evidence.  *See Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013); *see also Reyes v. State,* 69 S.W.3d 725, 740 (Tex. App.—Corpus Christi–Edinburg 2002, pet. ref'd) (noting that remoteness of prior offenses affects their probative value but does not automatically render the evidence inadmissible on that basis).

The evidence shows that Moseley, charged with vaginal penetration of a twelve-year-old girl, also vaginally penetrated a six-to-eight-year-old girl approximately eight to ten years ago and did the same to a ten-year-old girl until she was thirteen approximately twelve years ago.  Although remote in time, the trial court could reasonably conclude that the extraneous offenses had an inherent probative force because they were (1) no more serious than the acts recounted by A.H., and (2) shared similarities based on Moseley's conduct, the age of the children at the time of the assaults, and the location of the assaults.  *See McCombs v. State*, 562 S.W.3d 748, 765–67 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see also Robisheaux v. State*, 483 S.W.3d 205, 220 (Tex. App.—Austin 2016, pet. ref'd) ("[W]e believe that the district court could have reasonably determined that the remarkable similarities between the extraneous offenses and the charged offenses strengthened the probative force of the evidence."); *see, e.g., West v. State*, 554 S.W.3d 234, 239 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (permitting

16

evidence "that appellant committed a lewd or lascivious act upon a ten-year-old girl about twenty-nine years before the trial" where the case at bar involved a ten-year-old complaining witness).

The State's need for the extraneous-offense evidence was high. As discussed above, (1) Moseley implicitly and explicitly accused A.H. of fabricating her allegations of abuse, (2) there was no physical evidence or eyewitness testimony supporting A.H.'s allegations, and (3) several of the State's witnesses simply reiterated what A.H. had told them. *See Hammer v. State,* 296 S.W.3d 555, 568–69 (Tex. Crim. App. 2009) ("Rule 403 . . . should be used sparingly, especially in 'he said, she said' sexual-molestation cases that must be resolved solely on the basis of the testimony of the complainant and the defendant."); *see, e.g.*, *Newton v. State*, 301 S.W.3d 315, 320 (Tex. App.—Waco 2009, pet. ref'd) (finding a twenty-five-year-old extraneous offense admissible based on the State's need for extraneous-offense evidence because the State had no physical evidence or eyewitness testimony).

In *Bass*, the State's case also rested on the complainant's testimony that the defendant sexually assaulted a child in the same location, where extraneous-offense evidence showed that he had also sexually assaulted two other, similarly-aged, girls. *Bass*, 270 S.W.3d at 562–63. The Texas Court of Criminal appeals rejected the defendant's Rule 403 argument, reasoning: "It seems obvious that, if the State can show that a defendant has committed similar sexual assaults against . . . children, an affirmative defense allegation that the victim [of the charged offense] fabricated her claims is less likely to be true" because the extraneous-offense evidence "directly rebuts the

17

defensive claims and has logical relevance aside from character conformity." *Id.* An evaluation of these factors weighs in favor of admission.

### 2. Confusion of the Issues and Undue Weight

"Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case. *Gigliobianco*, 210 S.W.3d at 641. The "tendency of an item of evidence to be given undue weight by the jury on *other than emotional grounds*," refers to evidence of which a jury is not properly equipped to judge the probative force—such as scientific evidence. *Id.* (emphasis added); *see Bass,* 270 S.W.3d at 641 (explaining that scientific evidence is type of evidence that "might mislead a jury").

I.W.'s and C.J.'s testimony concerned matters readily comprehensible by lay people, and their testimony was directly relevant to the only issue in the case—whether Moseley abused A.H. Any potential risk of confusion or undue weight regarding I.W.'s and C.J.'s testimony, however, was mitigated by the trial court's charge instruction to the jury that it could only consider their testimony for proper purposes:

> Any testimony and evidence that the defendant has committed the separate offenses of Indecency with a Child or Aggravated Sexual Assault of a Child was admitted for any bearing that testimony and evidence has on relevant matters, including the character of the defendant and acts performed in conformity with the character of the defendant. You cannot consider such testimony and evidence unless you find and believe beyond a reasonable doubt the defendant committed the separate offenses.

We presume that the jury obeyed these instructions. *See Curry v. State*, 541 S.W.3d 751, 758 (Tex. Crim. App. 2017); *see, e.g.*, *Chasco v. State*, 568 S.W.3d 254, 261 (Tex. App.—Amarillo 2019, pet. ref'd) (finding the trial court did not abuse its discretion in permitting testimony regarding extraneous offenses when the "jury was instructed that it could consider the testimony regarding appellant's extraneous

18

offenses . . . only if it found beyond a reasonable doubt that appellant committed the offenses."). Consequently, these factors also weigh in favor of admission.

### 3. Undue Delay and Needless Presentation of Cumulative Evidence

The last two factors concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Gigliobianco*, 210 S.W.3d at 641. C.J. was on the stand for a relatively brief period of time; her entire testimony occupies only twenty-one pages of a trial transcript that spans more than 600 pages. I.W. testified for a longer period; however, we note that any disparity in length was due to Moseley's cross-examination of I.W., which exceeded the State's direct-examination and alone spanned twenty-six pages of the record. *See Lane v. State,* 933 S.W.2d 504, 520 (Tex. Crim. App.1996) (holding that the factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony); *but see McGregor v. State,* 394 S.W.3d 90, 121–22 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (upholding the trial court's decision to admit the evidence although evidence of extraneous offenses constituted one-third of trial and weighed against admissibility). Accordingly, these factors weigh in favor of admission, even if only slightly.

We conclude that the trial court did not err in admitting testimony of extraneous-offense evidence in its denial of Moseley's article 38.37 and Rule 403 objections. *See Gigliobianco*, 210 S.W.3d at 642–43; *see also Gonzalez*, 544 S.W.3d at 370; *Dabney*, 492 S.W.3d at 317. We overrule issue one.

19

### III. OUT-OF-COURT STATEMENTS

By his second issue, Moseley contends that the trial court erred in allowing witnesses to testify to statements made by A.H. and I.W. under Rule 801(e)(1)(B). TEX. R. EVID. 801(e)(1)(B).

#### A. Standard of Review and Applicable Law

In relevant part, Rule 801(e)(1)(B) gives substantive, non-hearsay status to prior consistent statements of a witness if: (1) the witness is subject to cross-examination concerning the statement, and (2) the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Id.* We review a trial court's decision to admit evidence for an abuse of discretion, and we view the evidence in the light most favorable to the trial court's ruling. *Klein v. State*, 273 S.W.3d 297, 304–05 (Tex. Crim. App. 2008) (citing *Hammons v. State*, 239 S.W.3d 798, 806 (Tex. Crim. App. 2007)); *Fears v. State*, 479 S.W.3d 315, 332 (Tex. App.—Corpus Christi–Edinburg 2015, pet. ref'd). Because no bright-line rule exists, the trial court has "substantial discretion" to admit a prior consistent statement if there has been "a suggestion of conscious alteration or fabrication." *Hammons,* 239 S.W.3d at 804–05.

#### B. Analysis

Moseley maintains that he did "not level an express or implied charge that A.H. or I.W. recently fabricated . . . their testimony." We disagree.

The record reflects that the forensic interviewer testified, over Moseley's hearsay objections, that A.H. made out-of-court statements to her regarding Moseley's abusive conduct. The trial court admitted this testimony as substantive evidence of appellant's

20

guilt under Rule 801. *See* TEX. R. EVID. 801(e)(1)(B). Moseley urges us to employ *Hammons* in our analysis. *Hammons,* 239 S.W.3d at 804–05. We find *Hammons* to be a persuasive, controlling authority and in representative opposition of Moseley's position. While questioning tactics by appellant in *Hammons* were "subtle," only becoming "vociferously express[ive] during appellant's closing argument," Moseley's questioning was unambiguous in his accusation of fabrication:

Q.     Okay. So you were lying when you told me final answer that he didn't touch you with his penis; is that right?

. . . .

Q.     Why did you feel like you could lie here today?

As discussed in the preceding section, Moseley did more than challenge A.H.'s credibility or passively suggest fabrication,[5] therefore the trial court did not abuse its discretion in admitting the complainant's prior consistent statement to the forensic interviewer. *Id.* at 804 ("There is no bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication, but the trial court should determine whether the cross-examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate."); *see also White v. State*, 256 S.W.3d 380, 383 (Tex. App.—San Antonio 2008, pet. ref'd) ("A reviewing court must

---

[5]   Moseley's trial counsel conceded both his impeachment of A.H. and the evidence's admissibility during a bench conference:

THE COURT:           Tell me why the rules don't allow—I mean, you admit that [A.H.] was impeached, right?

[COUNSEL]:           Absolutely.

THE COURT:           Then tell me why they don't get to bring in a previous consistent statement.

[COUNSEL]:           Because I think the law is wrong, Judge.

21

consider the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, and may also consider clues from the voir dire, opening statements, and closing arguments.").

Moseley was far less pronounced in his assertion of fabrication in his cross-examination of I.W. Against Moseley's overruled objections, the trial court also admitted evidence of I.W.'s out-of-court statements through her mother, assistant principal, and the State's investigator. The trial court, however, was free to interpret Moseley's "tone, tenor, and demeanor" in his questioning of the plausibility of I.W.'s allegation, coupled with the surrounding circumstances—from Moseley's opening statement that "Everybody has a motivation to lie[,]" to his cross-examination of A.H.—in its determination of whether a charge of fabrication occurred. *See Hammons,* 239 S.W.3d at 808; *see, e.g.*, *Martinez v. State*, 276 S.W.3d 75, 82 (Tex. App.—San Antonio 2008, pet. ref'd) (deferring to a trial court's observation that the requirement of fabrication had been met "[a]lthough the defense questioning could be characterized as merely challenging [the witness's] credibility."). The "'sinister seed of innuendo' sowed during cross-examination came to full fruition" during Moseley's closing argument, when his charge of fabrication against I.W. became unequivocal: "[A.H.] admitted that she is a liar. . . . [I.W.] is another one who doesn't know the truth." *See Hammons*, 239 S.W.3d at 808.

Having reviewed the record, we defer to the trial court's "substantial discretion" to admit prior consistent statements after determining that the witness's credibility has been challenged, and we conclude that the trial court did not err in admitting A.H.'s and I.W.'s out-of-court statements under Rule 801(e)(1)(B). *See id.* at 804–05; *Fears*, 479 S.W.3d at 332. We overrule issue two.

22

## IV. CONCLUSION

The trial court's judgment is affirmed.

GREGORY T. PERKES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
12th day of September, 2019.